CLARK et al. v. NATIONAL LINSEED OIL CO.

(Circuit Court of Appeals, Seventh Circuit.    January 2, 1901.)

No. 718.

1. CORPORATIONS—APPOINTMENT OF RECEIVER—SUIT BY MINORITY STOCKHOLD-
ERS.
   That a corporation has lost or disposed of the greater part of its prop-
erty, and permanently abandoned its business, is not alone ground for the
appointment of a receiver for its remaining assets on application of minor-
ity stockholders, but it must be shown in addition that its officers have
been guilty of mismanagement of its affairs, which renders a receivership
necessary to preserve the property for its creditors and stockholders, and
for that purpose general averments of negligence and misconduct on the
part of the officers are not sufficient, nor is the mere belief of affiants
that frauds have been committed.

2. SAME—SUFFICIENCY OF SHOWING.
   A bill filed by stockholders owning but 3 per cent. of the stock of a
corporation, making general charges of fraud and misconduct against its

officers, and verified as to the incriminating part of such charges only on information and belief, is insufficient, treated as an affidavit, to warrant the appointment of a receiver for the corporation against the wishes of the other stockholders, and a specific denial of the alleged misconduct in the answer, which is positively verified by one having knowledge of the facts; and especially where the real purpose of the bill is to secure the appointment of a receiver who will bring suits against the officers and directors in the name and at the expense of the corporation, where complainants, as individuals, have a remedy by suit in their own names to recover for the losses they may have sustained through the frauds and misconduct of the officers.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The bill is on behalf of appellants, owners of forty-six hundred shares of the capital stock of the appellee—the total issue being one hundred and eighty thousand shares—and all other stockholders of the appellee joining therein. No other stockholders have, however, joined. Its object is to wind up the company, and appoint a receiver. It avers, in substance, that upon the organization of the company in 1890 it became the owner of over forty linseed mills situated in various parts of the United States, worth five millions of dollars, and other property to the amount of two million dollars, besides a valuable trade and good will; but that despite this valuable property, the company was not successful, and was so negligently and badly managed, by its officers, that, by the year 1898, its assets had been almost entirely dissipated.

The bill, then, coming to particulars, proceeds as follows:

"That in the year 1895 the said Alexander Euston, being president of the defendant company, entered into a speculation in the shares of stock of the said company wherein he undertook, together with one Edgar T. Wells and the London Share & Debenture Company of London, England, to enter into a contract for the purchase of shares of stock of the said company, and that in pursuance of the said contract some six thousand of the said shares of stock were actually purchased at a price of about thirty dollars per share; but the market price of the said stock soon began to decline and thereupon, after the price of said stock had so declined, said Euston, on to wit, about the 24th day of July, 1895, with the knowledge and consent of the said McCulloh and other Directors, (but as your orators are advised and believe without the knowledge of all the Directors) caused the said contract to be assumed by the company as its own obligation, and thereupon the company, acting through the said Euston and the said Directors, paid to the said Euston about twenty thousand dollars ($20,000.) to reimburse said Euston for margins which had been put up by him on account of said purchase, and in the same way the said company pledged certain of its securities to secure any loss that might result from said speculative deal; and your orators allege upon information and belief that at the time of this transaction the said Euston and the said Directors knew that the said contract was not an advantageous contract, and that they acted therein with the sole end in view of assisting the said Euston to shift upon the company the liability and probable loss under the said contract; your orators further show that the price of said shares so purchased did decline and that the said stock was finally sold out at an additional loss to the company of about one hundred and thirteen thousand dollars ($113,000.) which said Euston and said Directors afterwards, to wit, in the year 1895, caused to be paid out of the monies of the said company contrary to law and good morals, a transaction entirely foreign to the business of the company, and one which,' as your orators charge, rendered the said Euston and the said Directors personally liable to the said company and its stockholders for the full sum so paid out of the company's funds. And your orators aver that such of the then Directors of the company as took no part in the said transactions, whose names your orators are unable to specify, did subsequently fully ratify and acquiesce in the said transactions, and that for several years past the

said transactions have been fully known, ratified and acquiesced in by all of those who then constituted the Board of Directors.

"And your orators aver that the foregoing transactions were carried on secretly and entirely without the knowledge or consent of your orators, and have only lately come to the hearing or knowledge of any of them, to-wit, on or about the month of October, 1898, nor could your orators by the exercise of reasonable diligence on their part have gained earlier knowledge thereof."

"And your orators show that in the spring and summer of 1898, and prior to August, 1898, the said Euston, acting with the knowledge and consent of a majority of the directors, and in the name of the company, but without the knowledge or consent of any of your orators, entered heavily into speculation in flaxseed on the Board of Trade in Chicago and at other places, buying hundreds of thousands of bushels of flaxseed in excess of the then present or possible future needs of the Company in the pursuance of its legitimate business, borrowing sums amounting to hundreds of thousands of dollars to carry on such speculation and executing the company's notes therefor, the exact amounts not being to your orators known; which said sums of money were deposited as margins in the purchase of flaxseed for future delivery at various times.

"Your orators state upon information and belief that said Euston sought by the purchase, upon margins, of these vast amounts of flaxseed with the money so as aforesaid borrowed, on the company's credit, to control the market by creating what is termed a 'corner' in flaxseed; and your orators aver that the said transactions in the flaxseed market, so carried on by said Euston with the funds of said company did cause a large temporary advance in the price of flaxseed but that owing to the inability of said Euston to any longer borrow money on the company's credit, he failed to bring about such a 'corner' or to uphold said advanced market prices, but the same rapidly declined from natural causes; in order to meet maturing obligations the company was then obliged to sell at a sacrifice the flaxseed which it had purchased at high prices caused by such purchases in said attempt to 'corner' the market; and that the net result was a loss to the company in said transactions of about five hundred thousand dollars, the exact amount not being known to your orators.

"Your orators aver that such use of the company's funds by said Euston and said directors was unauthorized and illegal and that the appropriation by them of the company's funds to pay losses incurred in such illegal speculations was contrary to law and good morals, and thereby said Euston and said directors became liable to repay the amount of such losses to the company, for the benefit of your orators and the other stockholders of said company.

"Your orators further show, on information and belief, that other losses of large amounts were incurred and paid out of the company's funds by said Euston and said directors in other previous speculations, similar to those specifically referred to as aforesaid, whereby other large sums of money of said company were lost, the amounts of which losses and the exact dates at which they were incurred your orators are unable to state."

"Your orators further show that by reason of the matters above set forth and by reason of various other negligence and mismanagement of the officers and directors, the said corporation ceased in the year 1891 to make any profits or declare any dividends, and as a matter of fact, no dividends have been declared by said company since the year 1891, except a certain false and fictitious dividend declared in the year 1895 as hereinafter set forth. That is to say, that during the year 1895 said Euston and the directors, fearing that the stockholders of said company would become dissatisfied by reason of the failure to declare dividends, secretly caused a resolution to be adopted by all the directors of said corporation, as follows, on to-wit the 21st day of August, 1895: 'Whereas the properties owned by this company have largely increased in value since they were purchased by reason of valuble and permanent improvements, and the natural and reasonable increase in value of the real estate during the past eight years, therefore be it resolved that the amount of plant account be increased to eighteen million

dollars ($18,000,000) including the permanent improvements made to this date,' and thereupon caused the following entry to be made upon the auditor's journal of said company, viz:

"'Plant account Dr. to Earnings, for amount of valuation of the properties of the Company, representing increased value on the original basis, covering a period of eight years, since 1887, as per resolution of the Board of Directors, adopted August 27, 1895, $1,122,359.28.'

"And thereupon said Directors caused a dividend of one per cent. to-wit, of one dollar on each share of $100.00 to be declared and paid to the stock-holders of said company; but your orators show as a matter of fact said resolution and the recitals thereof were wholly false, and that said plants and properties had not increased in value, but on the contrary, since the year 1890 and up to and including the year 1895, said plants and properties had enormously decreased in value, and large numbers of said plants and properties had been allowed to fall into disuse and had become dismantled and wasted and practically worthless to said company, so that as a matter of fact said Plant and Property Account should have been diminished by many millions of dollars at the time when it was fictitiously increased as above set forth and that the said dividend of. one per cent. was not paid out of any profits of the said corporation but was in fact paid out of the capital, thereby seriously crippling the resources of the company and impairing the practical operation of its business.

"And your orators aver that the above mentioned facts were entirely unknown to your orators at the time said action was taken, and have only lately come to the ears of your orators, or any of them, to-wit, on or about the month of October, 1898, nor could your orators, by the exercise of reasonable diligence on their part have gained earlier knowledge thereof."

It is further averred that in September, 1898, the affairs of the company being then in a desperate condition, the majority of the stockholders, at the inducement of the directors of the company, deposited their stock with the Central Trust Company of New York, in a trust for a certain reorganization committee; that this stock was deposited under an agreement by the terms of which the committee was to formulate a plan for a reorganization, submitting the same to the stockholders for their approval; that no plan has ever been formulated by the committee or submitted to the stockholders; but that instead thereof the committee permitted the directors, in December, 1898, to sell and transfer practically all the assets of the company to a new corporation called the American Linseed Company for an inadequate consideration; that the Central Trust Company refuses to return the said stock to its owners, and that this action on the part of the Central Trust Company was taken by collusion with Euston and the directors for the purpose of preventing any proceedings by the stockholders, on account of any of their acts of misconduct.

It is further averred that since the said transfer the appellee has permanently ceased to carry on its business, and its directors have permanently ceased to hold meetings, but that other moneys are still left in the hands of Thomas G. McCulloh, one of the directors of the company, and one of the parties who participated in the management of the company, and the various acts of misconduct; that the directors have refused to prosecute the company's claims against Euston and themselves for their personal liability on account of the acts of misconduct, and a receiver is asked to take possession of the assets of the company, including this claim against the directors, and to administer the same, proceeding to wind up the affairs of the company, and distribute its assets among those entitled thereto.

The bill is sworn to by each of the appellants, the jurat in each case reading substantially as follows: "That he" (the affiant) "has read the Bill of Complaint and knows the contents thereof, and that the allegations therein made are true, except as to such allegations as are therein said to be upon information and belief, and that as to such allegations he believes them to be true."

The answer, in effect, denies that the directors, at any time, acted in bad faith, or in excess of their powers, or used their control over the property

for any improper purpose, or for the furtherance or carrying on of any secret or speculative transactions in oil or flaxseed, or in stocks or bonds, either on the Board of Trade in the City of Chicago or elsewhere. It is denied that the directors ever made secret speculative contracts for the purchase or intended purchase, or sale of flaxseed with the funds of the company, or that any speculative deals whatever in flaxseed were made. It is denied that, by reason of any of the acts set out in the bill, the appellee lost any sum of money or failed to make any profits, or declare any dividends, except in the ordinary and legitimate conduct of the business, or that the said appellee was ever engaged directly or indirectly, or that any of its funds or credit have ever been used, in any attempt to corner flaxseed, on the Board of Trade in the City of Chicago or elsewhere.

Respecting the alleged loss in the year 1898 on flaxseed, the answer states that the appellee bought upwards of two million bushels of said seed for future delivery as its manufacturing necessities required; that such amount was much less than these manufacturing necessities: and that, owing to causes set forth in detail, none of which were fraudulent or negligent, or in the nature of speculation, or unfair toward the company, the appellee was unable to take the flaxseed. and pay for the same as agreed upon, and that, by reason thereof, lost about twenty cents per bushel on the two million bushels of flaxseed.

Respecting the dividend of one per cent. declared in 1895, the answer avers that the said dividend was paid out of the surplus over and above its capital stock, after the charging off of certain purchases, and that such dividend was ratified by every stockholder of the appellee by accepting the same, no stockholder having ever offered to return the sum.

Respecting the purchase of the stock on account of the contract made in the name of Euston with the London Share & Debenture Company, it is averred in the answer that said purchase was made by resolution July 24th, 1895, and that all the stockholders since that time have had opportunity to ascertain, by inspection of the record books, the fact of said purchase; that the purchase was in good faith for the sole and only purpose of aiding the appellee in borrowing money on ten year unsecured bonds, so that it might retire its short time paper, thus greatly benefiting the appellee, and that the directors, in good faith, believed, and were advised that they had the legal right to make such contract; it is denied that such contract was brought about by false representation of Euston, or any one else, or that the stock so purchased diminished in value, on account of any fraudulent or unlawful act by said Euston; but, it is averred, that no circumstance was known at the time which indicated that said contract would cause a loss to anybody.

The answer in detail states the business causes leading to the failure, and the litigation ensuing, as well as the steps taken to reorganize, and the sale to the new company.

The answer is sworn to by Thomas G. McCulloh, vice-president of the appellee. The jurat reads that the affiant "knows the contents thereof and that the same is true in substance and in fact."

The report of a certain committee. unsworn to, is submitted with the bill, and the report of another committee, also unsworn to, together with affidavits in support of the answer, are submitted with the answer.

Upon the bill and answer and affidavits filed, as thus substantially stated, the motion for a receiver was originally denied. Thereupon a motion was made to set aside the order of denial, and this motion was overruled, and the bill dismissed.

It was stated at bar, upon the hearing, that no error to the order, on account of the dismissal of the bill, would be insisted upon.

The contention of the appellants, on the motion for the appointment of a receiver, was based upon the two following propositions, as stated by their counsel:

I.—"The National Linseed Oil Company has sold all its tangible property and permanently abandoned the business for which it was incorporated. Its remaining assets therefore constitute a trust fund to be distributed among the stockholders and creditors. But the officers and directors now in control are not proper persons to perform that office by reason of various acts

of misconduct, past and present, and consequently the court should undertake the office by appointing a receiver.

II. "The Central Trust Company unlawfully holds a majority of the stock of the National Linseed Oil Company. The entire control of the Company is thus in the hands of those who have no right to that control. The rightful owners of the stock have no practical remedy against the Central Trust Company. The only means of effectively and immediately getting the control of the Company out of the hands of those not entitled thereto and into some lawful hands, is to have the court itself take possession, on the petition of these stockholders, who represent in this suit the whole body of the stockholders."

Martin T. Baldwin, for appellants.

H. S. Stone, for appellee.

Before WOODS and GROSSCUP, Circuit Judges, and SEAMAN, District Judge.

After the foregoing statement of the case, GROSSCUP, Circuit Judge, delivered the opinion of the court, as follows:

The proceedings below were irregular, and possibly present no question for review. At most we can consider the appeal as upon a final hearing below upon bill, answer and affidavits; this is, properly, the effect of the waiver of the technical error embraced in the dismissal.

The effect of appointing a receiver over a corporation is to take the property out of the control of its officers, to whom it has been entrusted by its stockholders. Courts proceed with extreme caution in the exercise of so summary a power; and this is true, not only in cases where the jurisdiction of the court is invoked upon general equity powers, but, also, where such powers have been extended by legislation with reference to the winding up of a corporation. Cessation of business, alone, does not make a fit case for the appointment of a receiver of the remaining assets of the company; it must be shown, in addition, that the officers have been guilty of mismanagement of its affairs, or that there exists some need to preserve the property, through a receivership, for the benefit of the creditors and stockholders. High, Rec. (3d Ed.) 292.

Applying these rules to the first proposition upon which the motion for a receivership is pressed—that the appellee has abandoned its business—it will be seen that the order of the court below is justified. The loss of the company's property, and its failure to continue doing business, independently of any causal mismanagement by its officers, is not ground sufficient for the appointment of a receiver; nor will a general averment of negligence and bad management on the part of its officers make good such insufficiency; nor will the mere belief of affiants that great frauds have been committed be sufficient, when it is not clearly shown in what the frauds consist.

Coming, then, to the averment of specific misdeeds, we greatly doubt if the hearing is not to be treated as upon bill and answer alone, in which event, the answer constituting a complete denial, there is no ground left for the appointment of a receiver. But, in our opinion, the same result follows, if we treat the bill as the affidavit of the

..five appellants, and the answer as a contra affidavit upon the part of but one affiant. The question is not whether five have sworn against one, but whether the affidavit of the five, upon the points in dispute, is so convincing, that the court below ought to have been persuaded of its truthfulness.

Paragraph VIII. of the bill, in substance, charges that Euston entered into a contract with the London Share & Debenture Company for the purchase of six thousand shares of its stock at about thirty dollars per share; that the market price of such stock soon began to decline; and that, after such decline, Euston, with the consent of some of the directors, caused the contract to be assumed by the appellee as its own obligation, reimbursing Euston for the margins put up by him on account of the purchase; and resulting, in the end, in a loss to the appellee of one hundred and thirteen thousand dollars. The answer admits these facts, but avers, in substance, that the purchase was made originally, by direction of the directors, in the name of Euston, but for the benefit of the appellee, so as to secure the retirement of certain short time paper. On this state of the proof no misconduct is, with anything like certainty, shown. It is true that the transaction is denominated a speculation, but the court does not accept names; it must look to facts, as to such averment. It is true, also, that the bill avers that the contract was not an advantageous one, and that Euston, and those joining him, acted therein with the sole end in view of assisting Euston to shift upon the company the liability and the loss the purchase had entailed; but the averment is not made upon the knowledge of the affiants, but only upon their information and belief.

Paragraph X, in substance, charges that Euston, with the knowledge and consent of a majority of the directors, bought, upon the Board of Trade, many thousand bushels of flaxseed, in excess of the then needs of the appellee, borrowing therefor, to margin said purchases, sums amounting to many thousands of dollars. The answer avers that the purchase was upwards of two millions of bushels; that it was much less than appellee's then manufacturing requirement; and that, owing to intervening financial difficulties, alone, the appellee was unable to take the flaxseed, whereby the loss occurred. No effort is made, on the part of the bill, to show the appellee's manufacturing need, in the way of flaxseed supply; nor, indeed, any of the particulars of the transaction, presumably accessible, through the books of the company. Such general averment, respecting a business transaction that should be put in evidence in detail, if at all, as also the general averment that the deal was in the nature of a speculation, are, to say the least, unsatisfactory. As a general charge in a pleading they are probably sufficient, for there the requirement is the ultimate fact; but as parts of an affidavit they violate the requirement that, in the matter of evidence, the court must have, not the ultimate, but the primary facts. The additional averment that Euston's motive was to corner the market, to his own personal advantage, is only upon information and belief.

The contention respecting the improper declaration of a dividend is left, as to the primary facts, equally obscure; except that, whether

the dividend was proper or improper, the appellants have shared in its fruit, and are offering to make no return.

These strictures upon the bill, as an affidavit, would be cogent, had all the stockholders, or a large proportion of them joined the appellants in their attack upon the president and directors; but they are still more cogent, when it is borne in mind that ninety-seven per cent. of the stockholders refuse such an alliance. Is it not probable that the ninety-seven knew, as well as the three, the details of these transactions? Is it probable that they would acquiesce in the misconduct alleged—misconduct so harmful to their interests? Under circumstances like these, there should be the clearest and most convincing presentation, in the affidavit, of the facts—each material one within the personal knowledge of the witness—to justify the court in disregarding the judgment of the ninety-seven, in an effort to meet the wishes of the three.

The purpose underlying the bill is plain. It is to get control, through a receivership, of the appellee's alleged right of action against the directors, so that such suit can be prosecuted in the name of the appellee, and at its expense. It is admitted that the appellants, as individual stockholders, have already a remedy against the directors for whatever loss they have suffered through the supposed frauds and misconduct; but the court is asked, preliminary to such suit, and as a preparation for it, to transfer the control of the corporation from the accused to the accuser, together with the corporation's cash assets available for the sinews of war. The court is, in effect, asked to prejudge the contest, and upon the bill as an affidavit, to give to the appellants the substantial fruits of victory, before the real contest has begun. We are not satisfied that there is a sufficient showing for so important an order.

The order of the court below will be affirmed.