SALOMON FREDERIK VAN OSS, et als.

*vs.*

PREMIER PETROLEUM COMPANY.

Cumberland.    Opinion March 4, 1915.

*Corporation.   Directors.   Equity.   Injunction.   Insolvency.   Public Laws of 1905.
Public Laws of 1907, Chap. 137.   Receiver.   Stockholders.*

This is a bill in equity, brought under the provisions of Chap. 85 of the Public
Laws of 1905, as amended by the Laws of 1907, Chap. 137, by the plaintiff in
behalf of himself and all other stockholders of the defendant corporation who
might become parties plaintiff, against the defendant, a Maine corporation,
located at Portland, praying for an injunction, temporary and permanent
receiver, and the liquidation and dissolution of the defendant corporation.

*Held:*

1.    Where express power is given by statute, if sufficient cause exists, to issue an
injunction both temporary and permanent, that having found sufficient cause
to issue an injunction, the court is authorized by Sec. 2 of Chap. 85, Laws of
1905, to appoint at the same time, or at any time afterwards during the con-
tinuance of the injunction, one or more receivers to wind up the affairs of the
corporation.   The power to so appoint is limited only by the continuance of
the injunction.   The reason for such appointment is found in the reason and
necessity for the injunction, and the exercise of the power to appoint in this or
similar cases must be left to the sound discretion of the sitting Justice in setting
in motion the equity powers of the court to accomplish that which he deems in
equity and good conscience the rights of the parties require.

2.    The record discloses a practical abandonment of the purposes of its original
promotors and owners, and the defendant thereby became and is a holding
company, and not a company doing the business for which it was organized.

3.    The declared purposes of the company do not constitute it a holding company
nor can such power be implied from the language used describing such pur-
poses.   True, certain powers were conferred to be exercised "to such extent as
may be necessary and proper for the carrying on of the company's business;"
but holding stock in another corporation was not one of such incidental powers
especially when the anomalous condition presented here exists—a going con-
cern whose active business has been exchanged for a passive minority represen-
tation in another company.   It was not one of the purposes of the corporation,
or an incident to the declared business purposes of the company, to supply
another company a sufficient working capital.

4.  The plaintiff and interveners had the right to demand liquidation, even if the same had not been promised.  The corporation was out of the business in which they had invested.  In the ordinary understanding of men, reasoning in the usual manner from actual facts disclosed, the business in which they had invested their money had stopped.  The directors by their own act had exhausted their power to reinvest in a new enterprise, further than the vote warranted it, or to jeopardize the interests of stockholders in new ventures against their will, but became and were trustees in fact, for one purpose only, and that to liquidate the company, because the stockholders expected liquidation, and again because they had the right to expect it, and with that in view have demanded liquidation.

5.  That the final fact found by the court that the defendant company had ceased to do business is supported by clear and convincing evidence, warranted both by the spirit and letter of the law, and in harmony with enlightened public policy.

6.  The bill of complaint stated a case within the statute.  No other conclusion could be reached without giving a new meaning to words of universally settled import and acceptation.  And this applies to the words "to liquidate your company" as well as to "ceased to do business."

On appeal by defendant from decree of sitting Justice denying the motions to vacate the receivership and injunction ordered, and from the final decree sustaining the bill and ordering dissolution of defendant corporation, and that such injunction and receivership be made permanent.

This is a bill in equity, brought by Salomon Frederik Van Oss, in behalf of himself and all other stockholders of the defendant company, who may elect to join as parties plaintiff, against the Premier Petroleum Company, a Maine corporation, praying for an injunction, temporary and permanent receiver and the liquidation and dissolution of the defendant corporation.  Defendant filed its answer to bill, and replications were filed by plaintiffs.  From decree granting an injunction and appointing temporary receiver, and from final decree sustaining the bill and ordering dissolution of defendant corporation, and that such injunction and receivership be made permanent, the defendant appealed to the Law Court.

The case is stated in the opinion.

*Woodman & Whitehouse,* for complainant.

*Robert T. Whitehouse,* for interveners.

*Verrill, Hale & Booth,* for respondent.

SITTING: SAVAGE, C. J., SPEAR, KING, HANSON, PHILBROOK, JJ.

HANSON, J.   This is a bill in equity brought under the provisions of Chap. 85 of the Public Laws of 1905, as amended by the Laws of 1907, Chap. 137, by the plaintiff in behalf of himself and all other stockholders of the defendant corporation who might become parties plaintiff, against the defendant, a Maine corporation, located at Portland, praying for an injunction, temporary and permanent receiver, and the liquidation and dissolution of the defendant corporation.

The case is before the court on appeal from the decree of the sitting Justice denying the motions to vacate the receivership and injunction ordered, and from the final decree sustaining the bill and ordering dissolution of the defendant corporation and that such injunction and receivership be made permanent.

The statute invoked by the plaintiff reads as follows:

"(Sec. 1).   Whenever any corporation shall become insolvent, or be in imminent danger of insolvency, or whenever through fraud, neglect or gross mismanagement of its affairs, or through attachment, litigation or otherwise, its estate and effects are in danger of being wasted or lost, or whenever it has ceased to do business, or its charter has expired or been forfeited, upon application of any creditor or stockholder by bill in equity filed in the Supreme Judicial Court in the county in which it has an established place of business, or in which it held its last stockholders' meeting, upon which bill such notice shall be given as may be ordered by any justice of such court, in term time or vacation, such court may, if it finds that sufficient cause exists, issue an injunction, both temporary and permanent, restraining said corporation, its officers and agents, from receiving any moneys, paying any debts, selling or transferring any assets of the corporation, or exercising any of its privileges or franchises until further order, and may at any time make a decree dissolving said corporation.

(Sec. 2.)   At the time of ordering any such injunction or at any time afterwards during its continuance, such court may also appoint one or more receivers to wind up the affairs of the company.

(Sec. 6.)   The court shall have jurisdiction in equity of all proceedings hereunder and may make such orders and decrees as equity may require."

The defendant company is a corporation duly organized under the laws of the State of Maine, May 9, 1910, with $3,000,000 capital stock issued and outstanding, $1,000,000 of which is common stock, and $2,000,000 preferred stock. The purposes of the corporation as given in the certificate of organization are as follows:

"To mine for, prospect, drill for, produce, buy, and in any manner acquire, to refine, manufacture into its several products, and to sell, market and dispose of, petroleum, and its products and by-products and residual products, and to carry on the general business of oil producers and oil operators, and, to such extent as may be necessary and proper for the carrying on of the Company's business, to lease, buy, and otherwise acquire, to hold and operate, and to sell, lease, incumber, or otherwise dispose of, oil, oil lands, oil leases and rights to explore for and remove oil, and to erect, acquire, construct, operate, maintain and sell, lease, incumber and in any manner dispose of, plants, refineries, buildings, machinery, pipe lines, goods, wares, merchandise, real and personal property, rights of way, easements, ordinances, franchises, privileges and other facilities necessary and proper for the carrying on of such business."

The company entered upon the business for which it was organized, and continued the same actively for about thirteen months.

The following from the bill of complaint sets out the principal contention of the plaintiff:

"The plaintiff is a stockholder of record in said defendant corporation, owning and holding of record at the present time 5000 shares of preferred stock of said company, and four shares of the common stock of the same."

"That in the month of July, A. D. 1911, the said defendant company sold and transferred all its property and assets, including its oil leases of 3660 acres of oil producing properties situated in the State of Oklahoma, United States of America, also oil collecting tanks and other equipment and all cash assets to a certain French corporation, to wit L'Union des Petroles d'Oklahoma (hereinafter called the Union Company) in exchange for $200,000 worth at par value of the seven per cent. cumulative preference stock of said Union Company and $2,000,000 worth at par value of the common stock of said Union Company; and that thereafter, and prior to the month of October, 1912, the Board of Directors of the defendant company sold $100,000 of the preferred stock of said Union Company

so acquired as aforesaid, for the sum of approximately $100,000, which money was thereupon deposited in the name of the defendant company at interest and still remains so deposited with the Swiss Bankverein of 43 Lothbury London E. C. England; and that at about the same time said Board of Directors of the defendant company deposited certificates payable to bearer for the remainder of its holdings so acquired as aforesaid in the said Union Company, to wit $2,000,000 worth at par value of the common stock and $100,000 worth at par value of the preferred stock of said Union Company for safe keeping with the Head Office of the Credit Lyonnais Boulevard des Italians Paris, where the plaintiff is informed and believes, and therefore avers, said certificates still remain. And the plaintiff further avers that the said Premier Petroleum Company at the time of the transfer of its said property and assets as aforesaid, ceased to do business, and since that time has not done or transacted any business whatever."

By amendment other reasons for equitable relief are set up by the plaintiff, as follows:

"That, through fraud, neglect and gross mismanagement of its affairs by the officers in control, the assets of the defendant company were in danger of being wasted and lost, although the company was then wholly solvent. That the corporation and its officers and present majority of stockholders in control, having obtained consent of the plaintiff, and other stockholders intervening, to vote to sell the assets of the corporation by promise of liquidation and dissolution, are estopped to attempt to carry on business or to refuse to liquidate the proceeds obtained from the sale of the assets of the company and dissolve the corporation."

On June 9th, 1911, the board of directors of the defendant company issued a circular to the stockholders calling attention to the fact that the quarterly reports indicated that the production of its properties since the formation of the company "had not come up to expectations, and remains considerably behind the figures which the experts had led to expect," and further stating that "there seems little doubt that both the productive capacity of the Nowata fields and the staying power of the wells have been overrated," . . . and "as a consequence the net revenue for the current year is certain not to come up to expectations." After noting the probable earnings, the financial statements conclude with these words: "It will be

seen that the margin of security above this dividend is not sufficiently large to relieve your Board from some uneasiness as regards the possibility of maintaining the dividends on your preferred shares without interruption for a considerable time to come."

Mention is then made of plans to counteract the decrease, by acquiring new properties and leases, improving the processes used, and the erection of a plant to save the lighter constituents from the crude petroleum, and then outlines the proposition which in the end led to the bringing of the case at bar, in these words: .

"Whilst these matters were under consideration, your Board received proposals for your Company to join a large combination of Oklahoma Oil Properties which is being effected under strong French auspices. There has been formed in Paris the Union des Petroles d'Oklahoma, with a share capital of 40 million francs, divided into:— 15,000,000 francs 7 per cent. Cumulative Preference Shares, and 25,000,000 francs Ordinary Shares" . . . .

"After protracted negotiations your Board have received a definite offer for all your properties and assets, as from June 1st, 1911, of 1,000,000 francs in fully paid Preferred Stock, and 10,000,000 francs in fully paid Common Stock of the said French Company. An offer has also been received to exchange your Common Stock against 50 per cent. of fully paid Ordinary Shares (that is to say to give 100 francs of Common Stock, Union des Petroles d'Oklahoma for every $40 Common Stock of your Company), to all such holders of Premier Petroleum Common Stock as are willing to accept this offer prior to October 1st next." . . . . "Having regard to this fact, to a possible increase of production owing to the development of the Robinson leases, and to the greater permanency and stability of production likely to result from the amalgamation, your Board have no hesitation in recommending the acceptance of the offer received, especially since the proposal seems to meet with the approval of some of your largest Shareholders, who together own a majority of your stock.

The Board have been informed that the Preferred Shares of the French Company will shortly be issued on the Paris Bourse, presumably at 110 per cent., whilst it is also intended to make a market in Paris and elsewhere for the Common Stock later on. It is intended to realize at some future date the shares in the 'Union' which your Company would acquire and to liquidate your Company.

We shall be glad to hear from you whether you approve of the offer being accepted, in which case we request you to return the enclosed form, duly signed, before June 16th next.   In the event of the requisite majority approving in writing, the Board propose to use without delay the powers conferred upon them by Section V, sub-section III of Art. II of the Company's by-laws, and to accept the offer made to the Company.   By order of the Board,

A. SCRIMGEOUR, Assistant Secretary."

The form of consent referred to, and which was signed by the holders of a majority of the stock issued, reads as follows:

"To the Board of Directors of

### THE PREMIER PETROLEUM COMPANY

(Incorporated under the Laws of the State of Maine, U. S. A.)

*Gentlemen,*

I, the undersigned, being a Stockholder in the Premier Petroleum Company, and having read the Circular issued by the Board under date June 9th, 1911, and having furthermore noted Section 5, Subsection 3, of Article II of the Company's By-Laws giving the Board power

'To sell or dispose of any of the real or personal estate, property, rights or privileges belonging to the Company, whenever in their opinion its interests would be thereby promoted; and with the consent in writing or pursuant to the vote of the holders of a majority of the stock issued and outstanding to sell, assign, transfer or otherwise dispose of the whole property of the Company'

hereby give my irrevocable consent to the Company's Board of Directors proceeding to sell, assign, transfer or otherwise dispose of the whole property of the Company on the terms set forth in said circular.

Witness ........... ........................      (Name) ..........................................
...... ........ ........ ......... .. ...................      (Address) ........ .................................
.................. ..... .................... .........      ................................ ............ .............
(Date).................................................."

At a meeting of the stockholders of the defendant corporation held on July 31, 1911, the following resolution was passed:

"Resolved, that having regard to the circular issued by the Board under date June 9th, 1911, and to section 5, sub-section 3 of Article II of the Company's by-laws giving the board power 'To sell or dispose of any of the real or personal estate, property, rights or privileges belonging to the Company, whenever in their opinion its interests would be thereby promoted; and with the consent in writing and pursuant to the vote of the holders of a majority of the stock issued and outstanding, to sell, assign, transfer or otherwise dispose of the whole property of the Company,' the Company's Board of Directors be, and are hereby authorized to sell, assign, transfer or otherwise dispose of the whole property of the company, on the terms set forth in said circular, and that all acts already done by the Board of Directors in connection with this transaction be, and are hereby, confirmed."

Said resolution was passed by the unanimous vote of all stockholders present.

The sale was made in July following, and this bill of complaint was brought in May, 1913.

Upon hearing, a writ of injunction was ordered, and a temporary receiver was appointed, May 26, 1913. On May 29, 1913, the defendant filed motions to vacate the temporary injunction, and order appointing a receiver. On May 31st, 1913, these orders were modified, practically suspending the operation of both until further order of court.

On July 23, 1913, twenty-seven stockholders representing 198,918 shares of the preferred stock of the Premier Petroleum Company filed their petition to intervene, and upon hearing were allowed to come in as plaintiffs under the bill of complaint as amended.

On October 2nd, 1913, the motion to vacate the temporary injunction, and motion to vacate the appointment of a receiver, were both denied, and a decree was entered restoring the effect of the original decree of May 26, 1913, granting temporary injunction and appointing a receiver, and the defendant thereupon claimed an appeal to this court.

On November 7, 1913, it was stipulated and agreed, by and between the plaintiffs and defendant, to submit the case upon the testimony already introduced at the previous interlocutory hearings, to cooper-

ate in the interest of an early determination of the case, preserving the status quo, "and it was further agreed between the parties hereto that in the event that upon appeal the Law Court shall decide in favor of the plaintiffs, the defendant shall cooperate with the plaintiffs in bringing about the dissolution of the defendant corporation and the liquidation of its assets and in obtaining the appointment of a permanent ancillary receiver satisfactory to said parties or to the Court making such appointment."

On November 24th, the case having been heard upon bill, answer, replication and proofs submitted, final decree was entered and filed, in which it was ordered, adjudged and decreed.

"1.   That the plaintiffs' bill be sustained with costs to be fixed by the clerk, and that execution issue for the same;

2.   That the defendant corporation, the Premier Petroleum Company, be and hereby is dissolved.

3.   That the preliminary injunction  .  .  .  .  be continued and made permanent.

4.   The receiver heretofore appointed be continued as permanent receiver of said corporation to wind up its affairs," together with further authorization to the receiver usual in such cases.

From such final decree the defendant claimed and took an appeal to this court.

In support of the first appeal counsel for the defendant quotes *Clark* v. *Linseed Oil Company,* 105 Fed., 787, (C. C. A. 7th Cir.) 792, as laying down the rule "that cessation of business alone does not make a fit case for the appointment of a receiver of the remaining assets of the company;" and urges that in the absence of impending danger, or the neglect or refusal of the present officers to convert the assets into cash, no reason appears for the interference by the court before final hearing.

Upon this question, as upon the principal question involved, the findings of fact by the sitting Justice will not be disturbed unless appearing to be clearly wrong; but since the question is raised we find no difficulty in holding that, where express power is given by statute, if sufficient cause exists, to issue an injunction both temporary and permanent, that having found sufficient cause to issue an injunction, the court is authorized by Sec. 2 of Chap. 85, Laws of 1905, to appoint at the same time, or at any time afterwards during the continuance of the injunction, one or more receivers to wind up

the affairs of the corporation. The power to so appoint is limited only by the continuance of the injunction. The reason for such appointment is found in the reason and necessity for the injunction, and the exercise of the power to appoint in this or similar cases must be left to the sound discretion of the sitting Justice in setting in motion the equity powers of the court to accomplish that which he deems in equity and good conscience the rights of the parties require.

From the time of the sale, the defendant's assets have consisted wholly of cash and stock of another company, holding therein a minority representation; and it appears that from the date of the sale of its property until the date of the bill of complaint on May 26, 1913, a period of nearly two years, it practically abandoned the business for which it was organized, and it continued to be what it became on July 9, 1911, a holding company merely.

It is contended by the eminent counsel for the defendant that in passing the resolution above quoted, to dispose of "the whole of the property of the company on the terms set forth in said circular that "there was no intention on the part of the stockholders voting to vote for the dissolution of the corporation; that language in said circular letter expressing an intent to liquidate the corporation at some future time had no influence whatsoever on the stockholders in inducing them to vote to sell the assets of the corporation; that the sale of the assets of said corporation made as of July 1, 1911, was not conditioned on the proceeds of said sale being immediately converted into cash and distributed among the stockholders; that it was the intention of the stockholders that the officers of the corporation should continue in control of its affairs and that the assets of the corporation should be managed by them according to their best judgment for the benefit of the stockholders duly expressed at regular stockholders' and directors' meetings."

To determine the intention of the stockholders from the record before us, and whether or not they were influenced by the circular letter referred to, we must necessarily consider the acts and utterances of the board of directors in dealing with the stockholders in the circumstances. The directors in their circular outline first, the unsatisfactory business experience of the corporation, and point out certain proposed improvements in the conduct of the business of the company, and turning abruptly from the suggestion of means and methods to continue business, and secure expected results, an

offer to sell to the "Union" is communicated to the stockholders, its advantages emphasized, its consummation recommended, and its accomplishment foreshadowed by the statement that the proposal "seems to meet with the approval of some of the largest shareholders, who together own a majority of the stock." The directors further informed the stockholders that the preferred shares of the "French Company will shortly be issued on the Paris Bourse, presumably at 110 per cent., whilst it is also intended to make a market in Paris and elsewhere for the common stock later on. It is intended to realize at some future date the shares in the Union which your Company would acquire and to liquidate your Company." The record discloses a well considered plan of the board of directors, so well executed that it must have influenced the acts of the stockholders, by establishing in their minds a doubt as to the present value of their stock, and holding out a prospect in case of sale of a sure return of their money for their preferred stock, and that a market would be made for the common stock, and ending with the declared intention to liquidate the company. The plan was made by the directors, the details were arranged by them, the form of consent to be signed by the stockholders which they prepared made specific mention of the Company's by-laws, authorizing the sale of the "whole property of the Company," and the resolution to sell began with the words "that having regard to the circular issued, and to the Article of the By-laws giving the Board power to sell:" There is disclosed a well-conceived plan, accompanied by a determined purpose to execute it. Assuming, as we must, that the stockholders had no intention or desire to liquidate their Company before the receipt of the circular and subsequent information, these acts of the Board of Directors could have no other effect upon a reasoning mind than to create a condition from which a normal brain could form but one intention, and that to intend liquidation, and get their money back; and the conclusion is irresistible that, from the receipt of the circular until the sale of their property, they were influenced by the representations and acts of the board of directors. Did the company by such sale cease to do business? Upon this question counsel on both sides have argued most earnestly, and upon their several contentions in relation thereto have relied most confidently, and we may say that aside from the consideration of this one question it is unnecessary to consider the other claims to relief, as it does

not appear that the differences admittedly existing between the larger stockholders had their foundation in fraud, or that there was necessarily mismanagement or impending danger.  We must deal with the case as we find it, and construe the statute invoked in harmony with what we believe to have been the intention of the legislature in making provision for winding up the affairs of a corporation when it has ceased to perform the business for which it was organized.  *Smith* v. *Chase*, 71 Maine, 164.

In the true interpretation and application of the statute resort must be had to a careful consideration of the powers conferred by, and the acts lawfully to be done under, the original organization of the defendant company, and to apply the same to the question here involved, in connection with the admitted and proven acts of both stockholders and board of directors.

The record discloses a practical abandonment of the purposes of its original promotors and owners, and the defendant thereby became and is a holding company, and not a company doing the business for which it was organized.

Defendant's counsel in his brief frankly makes the following statement in support of his main contention that the company has not ceased to do business, and that it was as well a holding company, viz: "In the lower court, plaintiffs' counsel laid considerable stress on the fact that the cash assets of the defendant corporation were conveyed to the Union Company, and from this argues an obvious intent to liquidate; but we submit that inasmuch as the assets taken over consisted in part of leases, the cash assets were taken over to avoid the complications incident to a computation of accruing rentals and similar bookkeeping problems, and were also taken over in order to provide the Union Company, which was to be the operating company, with a sufficient working capital."

The "Union" had taken over, with all the other property, the cash of the defendant in order to provide the Union Company, which was to be the operating company, a working capital.  The "Union" was represented as having a share capital of 40 million francs, and a working capital of about 4,500,000 francs.  The declared purposes of the company do not constitute it a holding company, nor can such power be implied from the language used describing such purposes.  True, certain powers were conferred to be exercised "to such extent as may be necessary and proper for the carrying on of the Company's busi-

ness;" but holding stock in another corporation was not one of such incidental powers—especially when the anomalous condition presented here, exists—a going concern whose active business has been exchanged for a passive minority representation in another company. It was not one of the purposes of the corporation, or an incident to the declared business purposes of the company, to supply another company a sufficient working capital.

At that point in the life of the defendant company, the plaintiff and interveners had the right to demand liquidation even if the same had not been promised.  The corporation was out of the business in which they had invested.  In the ordinary understanding of men, reasoning in the usual manner from actual facts disclosed, the business in which they had invested their money had stopped.  The directors by their own act had exhausted their power to reinvest in a new enterprise, further than the vote warranted it, or to jeopardize the interests of stockholders in new ventures against their will, but became and were trustees in fact, for one purpose only, and that to liquidate the company, because the stockholders expected liquidation, and again because they had the right to expect it, and with that in view have demanded liquidation.  The directors were not without their rights, the principal one being to have a reasonable time in which to liquidate.  Whether or not the time elapsing before suit was reasonable, we must assume was passed upon by the sitting Justice, and we see no reason to doubt that it was considered and found to be a reasonable time, for it was contended below, as it is here, that the company, through its board of directors, had still the right to reinvest in new propositions, and renew its business, if in the judgment of the board of directors it was deemed advisable.  Such being the past and present attitude of the directors, the question of reasonable time may be treated as settled, but the condition develops irreconcilable differences between the contending parties which amply justifies the prayer for the interference of the court in equity.  We are persuaded that the facts warrant the finding that the present condition of the defendant is not included within its original purposes, or necessary or incidental thereto, and that the final fact found by the court that the defendant company had ceased to do business is supported by clear and convincing evidence, warranted both by the spirit and letter of the law, and in harmony with enlightened public policy.

There is no allegation of present or imminent insolvency. The defendant alleges that it is solvent, denies that it has ceased to do business and denies any intent on the part of its officers to deal improperly in any way with its assets.

The question has not heretofore been raised in this State, but in two instances this court has had occasion to consider the statute under consideration as it related to other conditions set out therein. The first mention of the statute is found in *Moody* v. *Development Co.*, 102 Maine, 365, where it is held that "chapter 85, Public Laws, 1905, under which a receiver had been appointed, was in effect an insolvent law, but the clauses under consideration related to" corporations which had become insolvent, or in imminent danger of insolvency, etc., etc.; and we there expressly excluded from consideration all other clauses of section 1, and the question here involved was not before the court. In that case the corporation was insolvent, and the case turned upon that point. The conclusion therein is here affirmed, and the reasoning adopted, to wit, "that the act of 1905 was clearly intended "for the liquidation of business interests when they can no longer continue in the ordinary course." "The scheme of the Act was to accomplish this end. Its purpose could not have been more plainly stated. The law can be invoked when, in the language of the Act, "its (corporation) estates and effects are in danger of being wasted or lost."

By parity of reasoning, and because the clause in question could not have been stated in plainer terms, and misconstruction of the words used is impossible, it follows that "the law can be invoked when, in the language of the Act, "it (the corporation) has ceased to do business." Does a going concern, a corporation, partnership or joint stock company, cease to do business when it sells all its property, plant, assets of all kinds, including cash, and the buyer takes possession? We think it does, just as does the individual cease to do business who sells his business to another and the business is taken over by the purchaser. The business has been taken over by the purchaser, and the seller is out of business. He may enter another business. That is a matter of individual choice, but until he does, he is out of business, has ceased to do that business. "Ceased to do business" are words in common use, and are to be construed in their natural and ordinary significance. 36 Cyc., 1114; and a declared intention to sell and liquidate is a controlling factor in determining

whether a corporation has ceased to do business. *Manchester St. Ry.* v. *Williams*, 71 N. H., 312. It is a familiar rule that when the language is clear and unequivocal it must be intended to mean what it has plainly expressed, and in such case it is not permissible to interpret that which has no need of interpretation. *Jones* v. *Jones*, 18 Maine, 313; *Davis* v. *Randall*, 97 Maine, 36. See *Wellington* v. *Corinna*, 104 Maine, 252. Again in *Pride* v. *Pride Lumber Co.*, 109 Maine, 152; a bill of complaint by a minority stockholder against the defendant and individual stockholders. The prayer of the bill was that the corporation and the individual defendants "be restrained from issuing and selling stock, from paying salaries or expending the funds of the corporation, for an accounting, and for a receiver. The corporation had ceased to do business, and was solvent. Questions of jurisdiction were raised, and the right of the court to grant relief prayed for, under its general equity power, challenged. In reaching a conclusion therein the opinion holds that "it is well settled that a court of equity, in the absence of statutory power, has no jurisdiction over corporations for the purpose of decreeing their dissolution and the distribution of their assets at the suit of one or more stockholders. 2 Cook on Corporations, Sec. 629; 10 Cyc., 988. We have a statute in this State which authorizes the court, under some circumstances, to wind up the affairs of a corporation, and decree its dissolution, upon a bill in equity brought by a stockholder or creditor. Laws of 1905, Chap. 85, as amended by the Laws of 1907, Chap. 137. And this case shows a state of facts which would have supported a bill brought under that statute."

We think further citation of authority unnecessary to justify or fortify the finding of the Justice who heard the case. The bill of complaint stated a case within the statute. No other conclusion could be reached without giving a new meaning to words of universally settled import and acceptation. And this applies to the words "to liquidate your company" as well as to "ceased to do business."

The entry must therefore be,

*Bill sustained with additional costs.*
*Decree affirmed.*