DEPARTMENT OF ENVIRONMENTAL
PROTECTION et al.

v.

John EMERSON.

Supreme Judicial Court of Maine.

Argued June 13, 1989.
Decided July 27, 1989.

James E. Tierney, Atty. Gen., Phylis Gardiner (orally), Asst. Atty. Gen., Augusta, for plaintiffs.

Jack H. Simmons, Kaighn Smith, Jr. (orally), Berman, Simmons & Goldberg, P.A., Lewiston, for defendant.

Before McKUSICK, C.J., and WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

McKUSICK, Chief Justice.

Defendant John Emerson owns and operates a tire storage and disposal facility in Durham. This case involves the efforts by the Department of Environmental Protection (DEP) and the State of Maine (collectively referred to as the State) to enforce environmental and fire safety laws against Emerson. On appeal Emerson challenges three orders of the Superior Court (Androscoggin County, *Alexander, J.*), entered December 22, 1988, in which the court: 1) incorporated and added to the terms of the preliminary injunction entered October 23, 1987; 2) appointed a receiver to ensure no further unauthorized acceptance of tires and to approve contracts for removal of tires; and 3) approved an attachment against Emerson's property in the amount of $20,000. This appeal raises important questions about the final judgment rule and about the allowable scope of a preliminary injunction. We hold the court's December 22, 1988, orders appealable and find no error in any of them.

## I.

### Facts and Procedural History

John Emerson owns 90 acres of land in Durham on which he operates both a municipal landfill for the Town of Durham and the tire storage and disposal facility that is the subject of this appeal. Emerson has been accepting tires at this facility since about 1960, and estimates that he has some 9 million tires on the property. Some of the tires are located near Newell Brook, a classified[1] body of water that passes through the property.

After inspecting Emerson's property in October of 1986, DEP notified Emerson that his facility was in violation of the waste management, fire protection, and water quality laws, and that he had expanded the facility without a permit in violation of 38 M.R.S.A. § 1306(1) (1989). DEP directed Emerson not to accept any more tires except those delivered pursuant to a contract he has with the Town of Durham. Nevertheless, Emerson continued accepting truckloads of tires, and further DEP inspections in April and August of 1987 confirmed that the tire piles had expanded. In addition, in May of 1986 a representative of the Department of Conservation's Bureau of Forestry inspected Emerson's tire facility and ordered that no

---

1. Maine waters are classified under that portion of the Waters and Navigation Law dealing with protection and improvement of waters. *See* 38 M.R.S.A. §§ 464–470 (1989).

further tires be accepted because the site was in violation of the hazard clearance law, 12 M.R.S.A. § 9301 (1981).

On September 16, 1987, the State filed a complaint for injunctive relief and for civil penalties alleging that Emerson was operating the municipal landfill and the tire storage and disposal facility in violation of the Hazardous Waste, Septage and Solid Waste Management Act, 38 M.R.S.A. §§ 1301 to 1319–U (1989); the DEP's Solid Waste Management Rules, chapters 400–405 (Dec. 5, 1983) and 406 (Feb. 24, 1987), *reprinted in* 06–096 C.M.R. 400–406 (1986); the Open Burning Law, 38 M.R.S.A. § 599 (1989); the 300–foot law, 38 M.R.S.A. § 421 (1989); and the hazard clearance law, 12 M.R.S.A. § 9301. The State's complaint also alleged that Emerson was creating a public nuisance in violation of 17 M.R.S.A. § 2802 (1983). The thrust of Emerson's defense is that his facility is grandfathered and not subject to the requirements of those laws.

Based on affidavits establishing that Emerson was continuing to accept tires, the Superior Court (*Delahanty, J.*) after a hearing granted the State's motion for a temporary restraining order on October 1, 1987. By the TRO, the court ordered Emerson to stop accepting tires other than those delivered pursuant to his contract with the Town of Durham. Following an evidentiary hearing on October 23, 1987, the court granted the State's motion for preliminary injunction. The court found that the tires were being handled in violation of the solid waste management laws and the forest fire control law so as to create a significant fire hazard. The court continued the restrictions contained in the TRO and ordered Emerson to take affirmative steps to reduce the fire hazard and bring his facility into compliance with the operating requirements of DEP's Solid Waste Management Rules. Specifically, the court ordered Emerson to:

a. Remove all tires from wooded areas on his property and from all areas within 300 feet of Newell Brook;

b. Clear a strip at least 50 feet wide to mineral soil on all sides of all tire piles on the property;

c. Remov[e] all grass, weeds, slash, brush, debris and other flammable material from within the tire piles and in all directions for a distance of 100 feet outside the 50 foot mineral strip; and

d. Reposition the tires into distinct piles covering no greater than 10,000 square feet of ground area and separated from adjacent tire piles by mineral soil strips measuring no less than 35 feet in width to permit access by firefighting equipment.

Recognizing that Emerson could not accomplish these tasks immediately, the court directed that Emerson "make all good faith efforts" to bring his property into compliance as soon as possible, and especially to take steps to reduce the fire hazard. The court ordered the parties to meet to establish a timetable for complying with the terms of the preliminary injunction, and report to the court by November 16, 1987. Finally, the court for good cause shown waived the requirement for security pursuant to M.R.Civ.P. 65(c).

On November 24, 1987, Emerson's counsel reported to the Superior Court that the parties had not agreed to a timetable for compliance and that although he was removing tires and clearing trees, Emerson was "financially incapable of having most of the necessary work done." Following a pretrial conference on December 11, 1987, the court ordered Emerson to submit a detailed plan for compliance with the preliminary injunction by December 21, 1987.

On January 5, 1988, with Emerson having submitted no plan, the State filed a motion for contempt. The parties stipulated for purposes of that motion that Emerson had gotten an estimate that it would cost $12,000 to prepare a plan for compliance with the preliminary injunction. After a hearing, the court (*Perkins, J.*) on March 16, 1988, found Emerson in contempt, finding that he had not made a good faith effort to bring his facility into compliance with the preliminary injunction as

amended by the pretrial order of December 11, 1987. The contempt order provided that Emerson could purge himself of the contempt if he: 1) immediately complied with the provisions of the preliminary injunction stated in paragraphs (a) through (c) above; 2) immediately retained a consultant to prepare a comprehensive plan for bringing the facility into compliance with all the conditions of the preliminary injunction; 3) submitted that comprehensive plan by June 1, 1988; 4) maintained a daily log describing all work done in response to the contempt order; and 5) reimbursed the State for its costs and reasonable attorney fees in connection with the contempt motion.[2] On June 2, 1988, Emerson filed a "plan" in which he proposed using a bulldozer and a cherry picker to bring his property into compliance, and made some other proposals regarding possible contracts for shredding and removal of tires. The State responded that Emerson's plan did not satisfy the requirements of the court's contempt order and urged the court to reject it.

During the fall of 1988 the State became aware that in addition to his failure to take the affirmative steps set forth in the preliminary injunction, Emerson was violating the preliminary injunction's requirement that he not accept delivery of any more tires from outside Durham. Based on uncontested affidavits establishing that Emerson had violated that express order in the preliminary injunction by accepting numerous truckloads of tires at his facility, the State on October 28, 1988, moved to modify the preliminary injunction. By an amended motion filed on November 18, 1988, the State requested, *inter alia,* the appointment of a receiver and the placing of a lien on Emerson's property to secure clean-up costs.

After a hearing on the State's motion, the court (*Alexander, J.*) on December 22, 1988, filed an order: 1) authorizing DEP to erect barriers to block further tire deliveries; 2) appointing a receiver to prevent tire deliveries and to approve contracts for removal of tires; 3) approving an attachment, including an attachment on trustee process, against Emerson's property in the amount of $20,000 to secure any judgment against Emerson; 4) requiring that all payments on the Town's contract for the municipal landfill and all proceeds of tire sales be paid into an escrow account pending final judgment;[3] 5) limiting tire deliveries from Durham residents to four tires per vehicle; and 6) in all other respects continuing in effect the preliminary injunction of October 23, 1987. The court also issued separate, more detailed orders approving the attachment and appointing a receiver. On January 20, 1989, new counsel entered an appearance on behalf of Emerson and filed a notice of appeal to the Law Court.

## II.

### The Final Judgment Rule

On this appeal Emerson challenges the three orders of the Superior Court entered on December 22, 1988. Specifically, he challenges the preliminary injunction entered on December 22, 1988, which incorporates and adds to the original preliminary injunction of October 23, 1987. He also challenges the order appointing a receiver to oversee operations at the tire disposal facility and the order approving the attachment.

In general, an appeal to this court lies only from a final judgment and interlocutory orders are not immediately appealable unless they fall within a recognized exception to the final judgment rule. *See, e.g., Bar Harbor Banking & Trust Co. v. Alexander,* 411 A.2d 74, 76 (Me.1980). *See also* 2 Field, McKusick & Wroth, *Maine Civil Practice* § 73.1 (2d ed. 1970) [hereinafter

---

2. Emerson responded to the contempt order by filing a motion for reconsideration, a motion for findings of fact and conclusions of law, and a motion for report of the case to the Law Court, all on the issue of who had the burden of proof to establish Emerson's ability to comply with the preliminary injunction. After a hearing on March 29, 1988, the court denied all those motions.

3. On January 27, 1989, on Emerson's motion, the court modified this portion of the injunction so that Emerson is now entitled to receive two thirds of the income from the sale of tires.

Field, McKusick & Wroth]. In this case we conclude that an exception to the final judgment rule applies to each of the court's three December 22, 1988, orders.

■ While the State correctly points out that we have refused to adopt any *per se* rule that preliminary injunctions are excepted from the requirements of the final judgment rule, *see* 2 Field, McKusick & Wroth § 73.3 (Supp.1981), we have permitted such interlocutory appeals in the past when "substantial rights of a party will be irreparably lost if review is delayed until final judgment." *Moffett v. City of Portland*, 400 A.2d 340, 343 n. 8 (Me.1979). In *Moffett* we allowed an appeal from the denial of a request for a preliminary injunction preventing public disclosure of statements made by police officers subject to disciplinary investigations. *See id.* We found that substantial rights of the police officers would be irreparably lost if review were delayed in that case because the denial of the preliminary injunction meant that the statements would be disclosed and the underlying question whether any part of those statements were protected under the Freedom of Access Act would become moot before any final judgment was entered. *See id.*

In this case, as in *Moffett*, we conclude that substantial rights may be irreparably lost if review is delayed until final judgment. The preliminary injunction here being appealed contains both prohibitory and mandatory provisions. It not only restrains Emerson from accepting tires from outside Durham, but also requires Emerson to take certain affirmative steps to bring his facility into compliance with the law. Because the preliminary injunction contains mandatory provisions, it must be distinguished from the merely prohibitory preliminary injunction at issue in *Myerowitz v. Howard*, 507 A.2d 578 (Me.1986). In

*Myerowitz* we dismissed an appeal from a preliminary injunction that prohibited defendant from practicing chiropractics in violation of a professional covenant not to compete. *Id.* at 579. If the preliminary injunction in this case had stopped at prohibiting Emerson from accepting any more tires, then it would be indistinguishable from the preliminary injunction in *Myerowitz* and we would dismiss this appeal for the lack of a final judgment. But the preliminary injunction also required Emerson to clean up his tire facility. If Emerson were to comply with the mandatory terms of the preliminary injunction and, after trial, the court had determined that he is for some reason exempt from the environmental and fire safety laws that the State seeks to enforce during the pendency of this action, then he would have taken those affirmative steps needlessly. Although Emerson has as yet made no substantial effort to comply with the mandatory aspects of the preliminary injunction, compliance will plainly involve substantial effort and expense on his part. In these circumstances, we conclude that Emerson's substantial rights might be irreparably harmed if review of the mandatory preliminary injunction were delayed until final judgment.[4]

■ With regard to the Superior Court's approval of the attachment, the State concedes that an attachment order is appealable under the well-established collateral order exception to the final judgment rule. *See Barrett v. Stewart*, 456 A.2d 10, 11 n. 1 (Me.1983); 2 Field, McKusick & Wroth § 73.2 (Supp.1981). The only question remaining with regard to the final judgment rule therefore is whether the order appointing a receiver falls within an exception to that rule. Although the order is clearly interlocutory, we conclude that in

---

**4.** We reject the State's argument that even if Emerson's appeal from the preliminary injunction fits within an exception to the final judgment rule, it should be dismissed as untimely because a preliminary injunction was first entered on October 23, 1987. Emerson's appeal is from the orders entered on December 22, 1988, which specifically incorporate and add to the original preliminary injunction. On that timely appeal, we review the entire package of injunctive relief granted as of December 22, 1988. *See United States v. Fort Sill Apache Tribe*, 205 Ct.Cl. 805, 507 F.2d 861, 864 (1974) (per curiam) (noting that an appealable interlocutory ruling might carry with it previous orders "to the extent [those previous orders] enter into the appealable ruling and are subsumed thereby").

the special circumstances of this case we should review that order at the same time that we review the other orders entered on December 22, 1988. The final judgment rule is a prudential rule designed to "advance[ ] the interest of judicial economy and avoid[ ] piecemeal review." *Bar Harbor Banking & Trust Co. v. Alexander*, 411 A.2d at 76. The three orders were all part of a single package of interim relief. Both the mandatory preliminary injunction and the order approving the attachment are immediately appealable. The three orders being parts of but one package of relief are inextricably interrelated. In these specific circumstances it would frustrate the very purpose of the final judgment rule to postpone review of the order appointing a receiver while reviewing the remainder of the package of relief granted on December 22, 1988.[5]

### III.

*Review of Order Appointing a Receiver*

■ The appointment of a receiver to enforce the terms of an injunction is a matter within the discretion of the trial judge. *See Consolidated Rail Corp. v. Fore River Ry.*, 861 F.2d 322, 326 (1st Cir.1988); *Van Oss v. Premier Petroleum Co.*, 113 Me. 180, 189, 93 A. 72, 75 (1915). When more traditional remedies such as further injunctive orders and contempt proceedings have not succeeded in obtaining compliance, "a court of equity is justified, particularly in aid of an outstanding injunction, in turning to less common ones, such as receivership, to get the job done." *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir.1976). In this case, the Superior Court acted well within the scope of its discretion in appointing a receiver after Emerson failed to comply with the preliminary injunction.

Without reiterating the entire history of the case, it is clear from the uncontested affidavits submitted with the State's motion requesting the appointment of a receiver that Emerson accepted at his facility numerous truckloads of tires from outside Durham in direct and patent contravention of court orders. The acceptance of tires continued even after the court found Emerson in contempt. The appointment of a receiver to oversee operations and ensure compliance with the terms of the preliminary injunction was thus fully justified by Emerson's flagrant disregard of the express terms of the injunction.

### IV.

*Review of Order Approving Attachment*

■ The Superior Court approved an attachment against Emerson's property, finding that "there is a reasonable likelihood that in this action plaintiffs will recover judgment including the costs and expenses of a receiver ... in an amount equal to or greater than $20,000...." On appeal we review the attachment order only for clear abuse of discretion, *see Precision Communications, Inc. v. Rodrigue*, 451 A.2d 300, 301 (Me.1982), and Emerson has demonstrated no such abuse of discretion here. The State showed not just a reasonable likelihood of success in this case—a "relatively low hurdle," *id.*—but a "high" likelihood of success, as discussed below. Moreover, with regard to the amount of the attachment, the State correctly points out that 38 M.R.S.A. § 349(2) (1989) provides for civil penalties of up to $10,000 per day for any violation of the laws administered by DEP. There is also little doubt that the receiver will incur costs and expenses in overseeing operations at Emerson's facility, and the attachment secures those expenses as well. In these circumstances the

---

5. At least in theory, the order appointing a receiver and giving him "full authority and control over the management and operation" of Emerson's facility is so similar to an attachment order that it might fall within the collateral order exception to the final judgment rule. *See* 12 C. Wright & A. Miller, *Federal Practice and Procedure* § 2986 (1973). *See also Connors v. International Harvester Co.*, 437 A.2d 880, 881

(Me.1981) (appeal allowed "where the impact of the preliminary injunction is so similar to the impact of an attachment"). The authority in other jurisdictions on this point is conflicting, *see generally* Annot., *Appealability of Order Appointing, or Refusing to Appoint, Receiver*, 72 A.L.R.2d 1009 (1960), and here we need not decide whether standing alone an order appointing a receiver is immediately appealable.

Superior Court committed no error in approving an attachment for only $20,000.

## V.

### *Review of Preliminary Injunction*

■ We now come to the issue of central concern on Emerson's appeal: whether the Superior Court abused its discretion in issuing the preliminary injunction of December 22, 1988. As we stated in *Ingraham v. University of Maine at Orono,* the party seeking a preliminary or permanent injunction generally has the burden of demonstrating to the court that the following four criteria are met:

   (1) that plaintiff will suffer irreparable injury if the injunction is not granted,

   (2) that such injury outweighs any harm which granting the injunctive relief would inflict on the defendant,

   (3) that plaintiff has exhibited a likelihood of success on the merits (at most, a probability; at least, a substantial possibility),

   (4) that the public interest will not be adversely affected by granting the injunction.

441 A.2d 691, 693 (Me.1982) (per curiam). In this case the State's burden was even greater. Because the requested preliminary injunction had mandatory aspects, the State had to show a clear likelihood of success on the merits, not just a reasonable likelihood. *See Committee of Central Amer. Refugees v. Immigration & Naturalization Serv.,* 795 F.2d 1434, 1441 (9th Cir.1986), *reh'g denied,* 807 F.2d 769 (9th Cir.1987); *Commonwealth v. Coward,* 489 Pa. 327, 342, 414 A.2d 91, 99 (1980).

The *Ingraham* criteria are not to be applied woodenly or in isolation from each other; rather, the court of equity should weigh all of these factors together in determining whether injunctive relief is proper in the specific circumstances of each case. *See Developments in the Law—Injunctions,* 78 Harv.L.Rev. 994, 1056 (1965) ("Clear evidence of irreparable injury should result in a less stringent require-

ment of certainty of victory; greater certainty of victory should result in a less stringent requirement of proof of irreparable injury") (footnote omitted). We agree with Emerson that because of the mandatory aspects of the preliminary injunction we should review it with heightened scrutiny; but when the equity court has balanced the relevant factors after hearing all the evidence on both sides, our role on appeal is limited to determining whether the court's grant of the preliminary injunction constituted an abuse of discretion. *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 428 (1973). *Cf. Crafts v. Quinn,* 482 A.2d 825, 830 (Me. 1984) ("Superior Court's denial of the mandatory preliminary injunction requested by appellants must stand unless plainly wrong or based on an error of law"). Emerson challenges the preliminary injunction on three grounds.

### A. *Likelihood of Success on the Merits*

■ The Superior Court found that the tires at Emerson's facility were being handled "in violation of the Maine Solid Waste Management Statutes and Rules and the Forest Fire Control Statutes, 12 M.R.S.A. § 9301, and in such a manner as to create a significant fire hazard." Based on the "clear nature of these violations," the Superior Court found that the State had demonstrated a "high" likelihood of success on the merits. The one and only question Emerson raises to challenge this conclusion is a question of law: whether his facility is grandfathered so as to be exempt from the requirements the State seeks to impose on him. The law is plainly against him on that question.

The Solid Waste Management Act was enacted effective October 3, 1973. P.L. 1973, ch. 387 (codified at 38 M.R.S.A. §§ 1301–1308 (1978).[6] Section 1308 of the Act provides, in relevant part:

   Rules and regulations adopted pursuant to this chapter concerning the location, establishment and construction of solid waste disposal facilities, *but not*

---

**6.** Since then the Act has been substantially expanded and is now called the Hazardous Waste,

Septage and Solid Waste Management Act. 38 M.R.S.A. §§ 1301 to 1319–U (1989).

*concerning alteration or operation,* shall not affect such facilities in existence prior to October 3, 1973.

38 M.R.S.A. § 1308 (emphasis added). Although the statute thus exempts solid waste disposal facilities in existence before October 3, 1973, from rules relating to "location, establishment and construction," such facilities are not exempted from rules relating to "alteration or operation." Emerson does not dispute that he is operating a tire disposal facility.

Effective February 24, 1987, DEP adopted chapter 406 of the Solid Waste Management Rules specifically governing storage and disposal of tires. Me.Dept. of Envtl. Protection Rules, ch. 406 (Feb. 24, 1987), *reprinted in* 06–096 C.M.R. 406 (1986). Section 5 of that chapter contains the specific requirements that the Superior Court imposed on Emerson in the mandatory portion of the preliminary injunction. Section 5 also states that these requirements apply to tire storage and disposal facilities that require "Site Location Law" approval. Section 2(B)(1) in turn provides that Site Location Law approval is required for "[a]ny person who proposes to establish a new waste facility or expand an existing waste facility for the storage of tires, the solid waste boundary of which will enclose an area that is 10,000 square feet or more...." The Basis Statement accompanying chapter 406 further clarifies that "this regulation establishes specific siting and operating criteria for all new facilities and expansions of existing facilities ..., as well as operating requirements for those facilities, or portions thereof, which were established prior to October 3, 1973, pursuant to 38 M.R.S.A. [§] 1308."

■ Under these rules, we conclude as a matter of law that the section 5 operating requirements apply to Emerson's facility. He has been accepting tires there up until the court appointed a receiver on December 22, 1988. The State presented ample evidence establishing that Emerson was operating his facility with tire piles larger than 10,000 square feet and that the piles were expanding. Emerson's contention that he was accepting tires at his facility before the waste management law was enacted does not exempt him from having to comply with current operating rules laid down by state law. Because Emerson chose to continue to operate his tire facility and has continued to expand that facility after October 3, 1973, his facility is expressly subject to the requirements of the DEP rules contained in chapter 406.

Emerson contends that his facility does not need "Site Location Law" approval and that the relevant provisions of section 5 of chapter 406 therefore do not apply to him. He relies on section 3(A)(1) of chapter 400 of the Solid Waste Management Rules, which provides generally that Site Location Law approval is required when a waste facility is located, established, or constructed, but which provides an exemption for "[a]ny land area ..., including dumps, used for disposing of solid waste or sludge prior to October 3, 1973...." What Emerson ignores or overlooks is the provision immediately following section 3(A)(1) that, consistent with section 1308 of the governing statute, states: "Note: Exempted waste facilities remain subject to portions of these rules affecting alteration, operation or closing." Furthermore, section 3(B)(1) of chapter 400, the section following the section Emerson relies on, provides that review and approval under the Site Location Law are required even for an exempted facility if that facility "expands horizontally onto contiguous or non-contiguous parcels or lots in the same immediate vicinity that are owned, leased or otherwise held by the facility owner or operator." Since Emerson relies exclusively upon his grandfathering argument—an argument we reject as a matter of law—the Superior Court if anything appears to us to have understated the State's likelihood of success by characterizing it as merely "high."

In addition to the evidence that Emerson's facility is in clear violation of the waste management laws and rules regulating tire storage and disposal facilities, the Superior Court also found, based on substantial evidence, that Emerson's facility was in violation of the hazard clearance law, 12 M.R.S.A. § 9301. The hazard clearance law, enacted in 1979, requires that

any dump containing waste "which might facilitate either the origin or spread of forest fires" be operated in compliance with that section. The Superior Court's finding that Emerson's facility does not meet the requirements of section 9301 lends further support, if any were needed, to its conclusion that the State had demonstrated a "high" likelihood of success on the merits. The high likelihood of success justifies not only the issuance of the mandatory injunction but also the Superior Court's exercise of discretion under M.R.Civ.P. 65(c) to waive the requirement that the State post a bond or other security. *See* 2 Field, McKusick & Wroth § 65.5 (1970).

## B. *Balancing of Harms*

Emerson next contends that the Superior Court abused its discretion by failing to take into account the harm the injunction would cause him, as required under *Ingraham.* But in issuing the preliminary injunction later incorporated into the December 22, 1988, order, the court specifically stated:

> Because of the clear nature of these violations, the fact that the defendant ignored warnings on several occasions about the violations, and the fact that the defendant has not taken steps to bring his facility into compliance with the law, and that the State's likelihood of success on the merits appears high; *a balancing of the interests clearly weighs in favor of granting a preliminary injunction.*

(Emphasis added). The court thus specifically balances the relevant interests, and we reject Emerson's argument that there was insufficient evidence on which to base a finding that the balance of interests weighed in the State's favor.

Emerson contends that the Superior Court erred in assessing the harm the preliminary injunction inflicts on him, emphasizing the great expense he will incur in bringing his facility into compliance and criticizing the State's failure to put on evidence of Emerson's ability, financial or otherwise, to comply with the preliminary injunction. But Emerson fundamentally misperceives the nature of the harm that the Superior Court was required to weigh in the balance. The harm to Emerson is not the burden and cost of compliance with applicable law. The harm that granting the preliminary injunction causes Emerson is simply the harm of taking the required steps now rather than later, after the trial on the merits. And the harm is not measured by the expense or difficulty of taking those steps, factors that are likely to increase with time rather than decrease. The Superior Court found that the State had demonstrated a high likelihood of success on the merits, a finding that we have confirmed by rejecting as a matter of law Emerson's only argument in defense—that his tire disposal facility is grandfathered from having to comply with the operating requirements of the DEP rules. Given that finding, it was reasonable for the Superior Court to conclude that the pertinent harm to Emerson from granting the preliminary injunction was relatively small.

Balanced against this harm to Emerson is the harm to the State, representing the public interest in this case, of allowing the facility to continue to pose an environmental and fire hazard during the pendency of this litigation. The rationale behind the waste management and fire safety laws is to protect the health and safety of Maine citizens. *See* 38 M.R.S.A. § 1302. During the hearing on the preliminary injunction, the State put on witnesses who described in detail Emerson's tire facility. A DEP representative, a representative of the Maine Forest Service's Division of Fire Control, and the Durham fire chief, all of whom had personally inspected Emerson's facility, described, with the aid of photographs, the location, size, and general condition of the tire piles and the hazards those piles represented. One of those witnesses described the special hazard posed by a fire in a tire pile, noting that these fires generate a lot of heat and heavy black smoke, and are difficult to put out. From all of this evidence, the Superior Court was well justified in finding that the environmental and fire hazard posed by Emerson's facility required immediate action.

## C. *Mandatory Aspects of the Preliminary Injunction*

■ Finally, Emerson makes a general challenge to the preliminary injunction, ar-

guing that it goes too far in requiring Emerson to take affirmative steps to come into compliance with applicable law. It is true as a general matter that the purpose of a preliminary injunction is to preserve the status quo pending final judgment, and that courts do not readily enter mandatory injunctions that grant part of the requested permanent relief. *See, e.g., Stanton v. Brunswick School Dept.,* 577 F.Supp. 1560, 1567 (D.Me.1984). However, the mere fact that a preliminary injunction has mandatory aspects does not *ipso facto* render the injunction invalid, especially when the status quo is causing irreparable harm to one of the parties. *See Crowley v. Local No. 82,* 679 F.2d 978, 995 (1st Cir.1982).

■ As discussed above, a preliminary injunction that requires the defendant to take affirmative steps requires that the plaintiff show a clear likelihood of success on the merits. *See Commonwealth v. Coward,* 489 Pa. at 342, 414 A.2d at 99. Here the State made that showing very amply, and the Superior Court was well justified in these circumstances in requiring immediate steps to reduce the environmental and fire hazard during the pendency of this litigation, which might take months or years to complete. *See id.* at 329, 343, 414 A.2d at 92, 99 (upholding grant of mandatory preliminary injunction enjoining operation of landfill and requiring the defendants to remedy the pollution discharged where likelihood of success was clear and safeguarding the public interest required affirmative steps). *See also Ferry–Morse Seed Co. v. Food Corn, Inc.,* 729 F.2d 589, 593 (8th Cir.1984) (upholding grant of mandatory preliminary injunction where merely maintaining the status quo would cause irreparable harm to the plaintiff).

We reject Emerson's related argument that the preliminary injunction in this case effectively grants final relief before trial on the merits. Although the trial in this case has been delayed,[7] we note that throughout the proceedings Emerson has had fair notice of the claims against him and has participated in several hearings at which he has had the opportunity to contest the facts put forward by the State. *Cf. Marshall Durbin Farms, Inc. v. National Farmers Org.,* 446 F.2d 353, 356 (5th Cir.1971) (reversing grant of preliminary injunction where the defendant had inadequate notice and opportunity to present effective response). Moreover, the fact that some of the relief granted in the preliminary injunction tracks the permanent relief requested in the complaint does not alone make the preliminary relief granted improper. *See, e.g., Commonwealth v. Coward,* 489 Pa. at 339, 343, 414 A.2d at 98, 99 (upholding grant of mandatory preliminary injunction that paralleled the relief requested in the complaint). *See also Developments, supra,* at 1058.

The affirmative steps required by the original preliminary injunction were not imposed with a blind eye to the difficulties of immediate compliance. The injunction only required Emerson to make a "good faith" effort to comply with applicable law. The actions taken by the court after the original preliminary injunction are all justified by Emerson's nearly complete failure to heed any of the requirements of that order. The factual history of this proceeding demonstrates that Emerson ignored the court's express order not to accept any tires from outside Durham. There was abundant evidence that Emerson did not make any substantial effort to reduce the fire hazard created by the tires at his facility. We find no error in the Superior Court's actions in response to this evolving situation.

The entry is:

Orders of December 22, 1988, affirmed.

All concurring.

---

7. The record suggests that the delay has been caused, at least in part, by Emerson's failure to comply with discovery requests.