Jeffrey H. CRAFTS et al.

v.

Rodney S. QUINN, Secretary of State.

Supreme Judicial Court of Maine.

Argued Sept. 20, 1984.

Decided Sept. 28, 1984.

Mittel & Hefferan, Robert Edmond Mittel (orally), Portland, for plaintiffs.

Peter Brann (orally), Robert S. Frank, Asst. Attys. Gen., Augusta, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

By a verified amended complaint filed on September 4, 1984, in the Superior Court (Kennebec County) the Libertarian and Populist parties, joined by certain of their candidates and other members, seek a declaration that the statutory deadline of July 1 for the filing of nominating petitions for independent candidates for President and Vice President violates the first and fourteenth amendments of the United States Constitution. After hearing, the Superior Court on September 6, 1984, denied plaintiffs' request for a mandatory preliminary injunction requiring the Secretary of State to place the names of the Libertarian and Populist candidates on the ballot for the election to be held on November 6, 1984. Plaintiffs now appeal the interlocutory order denying the preliminary injunction. We dismiss their appeal. Appellants fail to bring themselves within any exception to the final judgment rule, and in any event they do not establish any error in the action of the Superior Court.

In order to be placed on the Maine ballot, candidates for President and Vice President not affiliated with a party that is qualified to participate in a primary election [1] must go through the process of nomination by petition provided for in 21 M.R. S.A. §§ 491–497 (1983 & Supp. 1983–1984). The Presidential and Vice Presidential candidates must collect nomination petitions

---

1. The Democratic and Republican parties are the only ones that currently so qualify under the statute, 21 M.R.S.A. § 321 (1983).

for their slate of electors, signed by no fewer than 4,000, but no more than 6,000, Maine voters. *Id.*, § 494(5)(A). Before the petitions are submitted to the Secretary of State for verification, local registrars must certify that the signatures are those of voters registered in their respective districts. *Id.*, § 494(7)(B). The Secretary must receive the certified petitions on or before July 1 of the election year.[2] *Id.*, § 494(9)(A). The nomination petition must be accompanied by written consents, signed by the candidates, stating that they will accept the nomination. *Id.* § 495.

The Libertarians began collecting signatures in Maine sometime in late May of this year, having nominated their national candidates for President and Vice President in September 1983.[3] As of the July 2 deadline, however, they had collected only 3,521 of the required 4,000 signatures. In addition, only 330 of those signatures had been certified by local registrars. The Libertarians have since that date done nothing to collect further signatures or to have their existing signatures verified. The Populists have failed to collect any signatures for their petitions. Only the Libertarian candidate for President has submitted the required consent form.

On July 2, 1984, Jeffrey Crafts and other Libertarians filed a *pro se* request for injunctive relief in the Superior Court, alleging that the deadline established by the statute was unconstitutional. A hearing was scheduled for July 9 but was postponed at appellants' request in order to give them time to retain counsel. They took no further action in the suit until September 4, when an attorney entered an appearance on their behalf and filed an amended complaint, which added the Populists as plaintiffs. On that same date, the Superior Court held a hearing on appellants' request for preliminary injunctive relief. At the hearing, appellant candidates asked the court to order their names to be placed on the ballot pending review of the statute's constitutionality, but they presented no evidence in support of their claim. Two representatives of the Secretary of State's office and an employee of the company responsible for printing the ballots appeared as witnesses for the State. They testified that absentee ballots had to be sent to municipalities by early October so that, by election day, the ballots could be distributed to absentee voters, completed, and returned. In order to have the ballots ready on time, all of the information for the ballots had to be in the hands of the printers by the first week in September.

The Superior Court denied appellants' motion for preliminary relief, finding that:

1. Any injury to the Plaintiffs was outweighed by the harm which granting the injunctive relief would inflict upon the Defendant.

2. The public interest would be adversely affected by granting the injunction.

3. The Plaintiffs were not diligent in the pursuit of their rights in this matter.

## I.

The usual rule that an appeal may be taken only from a final judgment need not be followed where "substantial rights of a party will be irreparably lost if review is delayed until final judgment." *Plumbago Mining Corp. v. Sweatt*, 444 A.2d 361, 368 (Me.1982), *quoting Moffett v. City of Portland*, 400 A.2d 340, 343 n. 8 (Me.1979). Another way of stating the principle is that where an interlocutory order has the practical effect of permanently foreclosing relief on a claim, that order is appealable. This exception to the final judgment rule is sometimes called the "death knell" doctrine. At first glance, the doctrine might seem to apply to the present case. If we

---

**2.** Pursuant to 21 M.R.S.A. § 3 (1983), the deadline was this year extended to July 2 because July 1 fell on a Sunday.

**3.** The Libertarians could have begun collecting signatures to qualify for the ballot on January 1, 1984. *See* 21 M.R.S.A. § 494(6).

were to require a final disposition by the Superior Court before we would entertain an appeal, the election would undoubtedly have come and gone before review in this court would be available, to say nothing of the printer's deadline date for printing the ballots. For several reasons, however, the death knell doctrine does not apply to the appeal now before us.

■ The first reason comes from the fact that appellants are themselves responsible for their present predicament. The Superior Court recognized that fact in holding that appellants' lack of diligence in pursuing their claim was one reason why the preliminary injunction should not be granted. Their failure at that time to prosecute their claim for two months is directly responsible for the time pressure that is now the only arguable justification for suspension of the final judgment rule in this case. If the hearing had been held as originally scheduled, on July 9, the appellants would not have been in a position to invoke the death knell doctrine for an immediate appeal to this court. It is anomalous that their failure to pursue their rights should create a new benefit for them, namely, interlocutory review by this court. *See Anderson v. Federal Election Commission,* 634 F.2d 3, 5 (1st Cir.1980). It is a firmly established principle that "extraordinary process will not be used to relieve a party from a situation which he has brought on himself by his own negligent act or omission." *Winters v. Allen,* 166 Tenn. 281, 62 S.W.2d 51, 52 (1933). *See Benoit v. Johnson,* 160 Me. 201, 202 A.2d 1, 5 (1964); *cf. Lane v. Derocher,* 360 A.2d 141, 143–144 (Me.1976) (laches). "[I]njunctive relief will be denied to those who slumber on their rights." *Int'l Union, Allied*

*Indus. Workers of Am., AFL–CIO v. Local Union No. 589, Allied Indus. Workers of Am., AFL–CIO,* 693 F.2d 666, 674 (7th Cir.1982). *See also Cook v. Equitable Life Assurance Society,* 428 N.E.2d 110, 116 (Ind.App.1981); *Mikulec v. United States,* 705 F.2d 599, 602 (2nd Cir.1983). *See generally* 30 C.J.S. *Equity* § 100, at 1062 (1965), and cases cited therein.

As a second reason for not departing from the final judgment rule, even now, nearly three months after the statutory deadline, appellants have not made any further progress toward complying with the statute's requirements of verified signatures and have only partially fulfilled the requirement of signed consents.[4] They were not ready to proceed with their candidacies should the Superior Court have declared the July 1 deadline unconstitutional, nor were they prepared to go forward even on the date of oral argument, September 20, 1984. It is extraordinary that appellants should be before this court in late September seeking expedited interim relief when since early July they have not made any effort to get the required number of verified signatures on their nominating petitions or the necessary consents.

As a third reason, appellants' delay in the prosecution of this case has eliminated any chance that might have existed for third persons to "test" the Libertarian and Populist candidacies by challenging the sufficiency of their nominating petitions.[5] Although this consideration was not seen as critical in the recent federal district court case of *Stoddard v. Quinn,* 593 F.Supp. 300, 308–309 (D.Me.1984), it gains added force here from the fact that the nominat-

---

**4.** These facts put the present case on a different footing than *Stoddard v. Quinn,* 593 F.Supp. 300, (D.Me.1984); *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Anderson v. Quinn,* 495 F.Supp. 730 (D.Me.), *aff'd without opinion,* 634 F.2d 616 (1st Cir. 1980); *McCarthy v. Briscoe,* 429 U.S. 1317, 97 S.Ct. 10, 50 L.Ed.2d 49 (1976); and *McCarthy v. Noel,* 420 F.Supp. 799 (D.R.I.1976), in all of which cases the candidates had complied with

all existing statutory requirements for placement on the ballot other than those claimed to be unconstitutional.

**5.** The challenge procedure is outlined in 21 M.R.S.A. § 496(2) (1983 & Supp.1983–1984). The challenge is first brought to the Secretary of State with appeals available to the Superior Court and finally to this court.

ing petitions are still not complete at this late date.

■ On the other hand, appellants assert that one of the most fundamental of citizens' rights, the right to vote for one's preferred candidate, is at stake in this case. If the Libertarian and Populist candidates are not placed on the ballot, it is claimed, the voting citizenry will be deprived of the opportunity to vote for them. In addition, the public at large will allegedly be deprived of the added political discourse provided by the presence of additional political parties. However, in every case cited in appellants' briefs, the plaintiffs had satisfied all the statutory requirements for placement on the ballot, including any requirement of signatures, except only those claimed to be unconstitutional. *See* n. 3 *supra.* Those cited cases thus differ from the present situation. Appellants, in failing to obtain even now the required nomination papers to show some minimal level of support for their candidates, have also failed to show that any significant detriment will result from their exclusion from the ballot. The threshold showing of support that Maine requires for placement on the ballot is 4,000 verified signatures. The legislature has declared, by enacting the threshold provision, that the harm suffered by the public from the exclusion of presidential candidates who fail to cross the threshold is so attenuated that those candidates need not be placed on the ballot. The validity of provisions requiring such a minimum showing of support is beyond question. *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *Anderson v. Celebrezze*, 103 S.Ct. at 1570 n. 9; *American Party of Texas v. White*, 415 U.S. 767, 783, 94 S.Ct. 1296, 1307, 39 L.Ed.2d 744 (1974); *see Storer v. Brown*, 415 U.S. 724, 738–746, 94 S.Ct. 1274, 1283–1287, 39 L.Ed.2d 714 (1974). Appellants do not question the validity of the petition and consent requirements they have failed to meet. Since they have failed to make the minimum required showing of support within the community, as such showing is

defined by 21 M.R.S.A. § 494(5)(A), they should not expect to benefit by asserting the hypothetical rights of "their" voters.

The fact that appellants may succeed at some future time in obtaining the verified signatures does not affect the result here. They have already had ample opportunity to perfect their candidacies and they have not done so. It was therefore inappropriate below, and it remains inappropriate now, that appellants should ask the courts so close to the election to require the State to wait for them to comply with the statute.

It might be argued that since appellants have not passed any *constitutionally valid* deadline for filing their petitions, they are therefore not in default of the statutory requirements. But this overlooks the posture in which the case is presented for review here. There is no relief that this court can give appellants that will entitle them to be placed on the November ballot, short of invalidating all of the requirements for candidacy. That this court has not been asked to do, and will not do.

■ In sum, appellants have not brought themselves within the ambit of the death knell exception to the final judgment rule. There is no reason here for us to depart from our usual prudential rule against entertaining interlocutory appeals.

## II.

■ In ordinary circumstances our conclusion that an appeal from an interlocutory order does not fall within any exception to the final judgment rule ends the matter. Normally, the interlocutory appeal would be dismissed without any comment on the substance of the decision below. We here, however, have an unusual situation where the reasons for the Superior Court justice's denial of the requested preliminary injunction track closely the reasons why the final judgment rule bars this interlocutory appeal. It is, therefore, appropriate in these special circumstances for us to comment on the issues appellants try to raise on their appeal. *Cf. Socec v. Maine Turnpike Au-*

*thority,* 152 Me. 326, 328–329, 129 A.2d 212, 213–214 (1957) (interlocutory appeal entertained where question on merits was the same as question of appealability). Further comment is also justified by the importance of the public issues here involved. We wish to make clear that our dismissal on the basis of the final judgment rule does not deprive appellants of any substantial rights. *Cf. Kelly v. Curtis,* 287 A.2d 426 (Me.1972) (legal question underlying mandatory order issued against the Governor decided by the law Court on appeal, even though the court held that mandamus does not lie against the Governor).

■ The Superior Court's denial of the mandatory preliminary injunction requested by appellants must stand unless plainly wrong or based on an error of law. *See, e.g., Bar Harbor Banking & Trust Co. v. Alexander,* 411 A.2d 74, 77 (Me.1980); *Usen v. Usen,* 136 Me. 480, 508, 13 A.2d 738, 752 (1940); *LeBeau v. Spirito,* 703 F.2d 639, 642 (1st Cir.1983). A trial court will grant a preliminary injunction only if it finds that:

(1) the plaintiff will suffer irreparable injury if the injunction is not granted,

(2) such injury outweighs any harm which granting the injunctive relief would inflict on the defendant,

(3) the plaintiff has exhibited a likelihood of success on the merits (at most, a probability; at least, a substantial possibility), and

(4) the public interest will not be adversely affected by granting the injunction.

*Ingraham v. University of Maine at Orono,* 441 A.2d 691, 693 (Me.1982) (per curiam). In the case at bar, we find no reversible error in the Superior Court decision that appellants failed the four-part test of *Ingraham.*

In arguing the first two prongs of the *Ingraham* test, appellants contend that if the Libertarians and Populists are denied *places* on the November ballot, the individual appellants and others will lose their right to cast votes for the candidate of their choice and thus will be irreparably harmed. At the same time appellants contend that the State will suffer only minimal increased expense and inconvenience.

■ Voting is a fundamental right, it is at the heart of our democratic process, and any attempt to restrict that right should be carefully scrutinized. However, we cannot say that the trial justice was plainly wrong in finding that the harm to the State from granting the injunction would outweigh appellants' injuries. The testimony introduced at the hearing on September 4 was that a significant lead time is necessary to accommodate the statutory procedure for challenging the petitions and to allow an adequate period for the distribution and return of absentee ballots by election day. In addition, the testimony at trial indicated that ordering the parties onto the ballot would have greatly disrupted the operations of the Secretary of State's office and significantly increased the cost of the printing. Preparation of the ballots including the Libertarian and Populist candidates would have eliminated any possibility of a third person's challenging the petitions, would have jeopardized the timely distribution of absentee ballots, and would have increased the State's expense and inconvenience.

■ The trial justice did not specifically rule on the third prong of the *Ingraham* test: likelihood of plaintiffs' success on the merits. Since appellants do not exhibit a substantial possibility of such success, this criterion as well supports the denial of the injunction. The United States Supreme Court decision in *Anderson v. Celebrezze,* 103 S.Ct. at 1570, states the controlling standard for analyzing ballot access laws:

Constitutional challenges to specific provisions of a state's election laws therefore cannot be resolved by any "litmuspaper test" that will separate valid from invalid restrictions. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first con-

sider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the Plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burdens imposed by its rule. In passing judgment, the court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. (citations omitted)

It is well settled that states are allowed to place some restrictions on ballot access. *See Storer v. Brown*, 415 U.S. at 730, 94 S.Ct. at 1279. The key issue is "the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens 'the availability of political opportunity.'" *Anderson v. Celebrezze*, 103 S.Ct. at 1572, *quoting Clements v. Fashing*, 457 U.S. 957, 964, 102 S.Ct. 2836, 2844, 73 L.Ed.2d 508 (1982) (plurality opinion).

 The process of challenge to nomination petitions is designed to prevent circumvention of the petition requirements in 21 M.R.S.A. § 494, and is the only screening of third-party candidates comparable to the nomination/primary/convention testing of major party candidacies. *See Communist Party of United States v. Gartley*, 363 A.2d 948 (Me.1976). It is thus an important procedure that cannot be said unfairly to burden political opportunity. Thus, even if appellants were persuasive in their argument that the printing and distribution schedules could be compressed, the independent candidates would have to present their petitions before the printing deadline to allow for the challenge period.[6]

The uncontroverted testimony below demonstrated the magnitude and difficulty of the printing task facing the State. The Secretary of State arranges for the printing and distribution of 284 different versions of a single ballot for all of the federal, state, and county offices in Maine. The numerous combinations of different officers to be elected in different municipalities result in the large number of different ballots. In addition, each ballot must be printed in specimen, absentee, and election day form.

It is also important that the Secretary of State receive the absentee ballots from the printer in early October so that those living away from their voting residences may exercise their franchise. The absentee ballots must be checked, sorted, and mailed to the municipalities by the Secretary's office. Then the individual municipalities must distribute the ballots to voters requesting them in time so that the ballots can be completed by the voter and returned to the municipal clerk by election day. This process can be protracted, given that some absentee voters live overseas.

Finally, appellants contend that the injunction would serve the public interest. The Superior Court found to the contrary. It ruled that this fourth part of the *Ingraham* test was not met and held that the public interest would be adversely affected if the injunction were granted. That ruling was not error. It is beyond question that third parties have played an important role in the political history of this nation. Third parties have served as outlets for frustrated minorities unable to find expression within either of the major parties, and they have proposed and explained new ideas to the public. Many of their once novel ideas have in time been accepted by the major

6. We do not decide whether, if plaintiffs were now before the court having completed all other statutory requirements, we would bar them from the ballot solely because of the lack of opportunity for others to challenge their petitions. *See Stoddard v. Quinn*, 593 F.Supp. 300, 309 (D.Me.1984).

parties.[7] But, as the Supreme Court decision in *Celebrezze* teaches, the public interest includes reasonable, legitimate regulation of the electoral process. As discussed above, an analysis of Maine's law under *Celebrezze* contradicts appellants' contention that the granting of the preliminary injunction would be in the public interest.

The Superior Court was not plainly wrong in finding that (1) any injury to the plaintiffs is outweighed by the harm that granting the injunctive relief would inflict upon the State and (2) the public interest would be adversely affected by granting the injunction. In addition, appellants failed to show any substantial possibility that they would prevail on the merits. Even if we were to entertain this interlocutory appeal, we would not find any error in the Superior Court's denial of the requested mandatory preliminary injunction.

The entry is:

Appeal dismissed.

All concurring.

Isaacson, Isaacson & Hark, Ronald L. Bissonnette (orally), Philip M. Isaacson, Lewiston, for plaintiff.

Hardy, Wolf & Downing, P.A., Thomas R. Downing (orally), William P. Hardy, Lewiston, for defendants.

Before McKUSICK, C.J., and ROBERTS, VIOLETTE, WATHEN and GLASSMAN, JJ.

---

**7.** For a thorough and concise review of the historical impact of third parties, *see* F. Small-wood, *The Other Candidates* 13–27 (1983).