MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:       2020 ME 123
Docket:         Ken-20-262
Argued:         October 14, 2020
Decided:        October 23, 2020

Panel:          MEAD, JABAR, HUMPHREY, HORTON,* and CONNORS, JJ.
Majority:       MEAD, HUMPHREY, HORTON, and CONNORS, JJ.
Dissent:        JABAR, J.


ALLIANCE FOR RETIRED AMERICANS et al.[1]

v.

SECRETARY OF STATE et al.[2]

MEAD, J.

[¶1]   On June 24, 2020, two organizations, the Alliance for Retired Americans and Vote.org, and two Maine residents, Doug Born and Don Berry (collectively ARA), filed a complaint in the Superior Court (Kennebec County) against Maine's Secretary of State and Attorney General (collectively the Secretary) seeking a declaration that, inter alia, (1) the statutory deadline established by 21-A M.R.S. §§ 626(2), 755 (2020) for receiving absentee ballots

---

* Although not available at oral argument, Justice Horton participated in the development of this opinion.  *See* M.R. App. P. 12(a)(2) ("A qualified Justice may participate in a decision even though not present at oral argument.")

[1]  On September 4, 2020, the trial court granted American Civil Liberties Union of Maine Foundation and Maine Conservation Voters leave to file an amici curiae brief in support of the plaintiffs.  We have also done so and allowed amici to participate at oral argument.

[2]  On August 21, 2020, the trial court granted intervenor-defendant status to Donald J. Trump for President, Inc.; Republican National Committee; National Republican Senatorial Committee; and Republican Party of Maine.  *See* M.R. Civ. P. 24(b).  Intervenors filed a brief and participated at oral argument in this appeal.

in an election; and (2) statutory provisions governing the validation and rejection of absentee ballots, *see* 21-A M.R.S. §§ 756(2), 759(3), (5), 762 (2020), violate the United States and Maine Constitutions. *See* 14 M.R.S. § 5954 (2020). The complaint asked the court to enjoin the Secretary from "rejecting ballots that are postmarked on or before Election Day and arrive at the election office within a minimum of ten days after Election Day" and "rejecting absentee ballots of otherwise eligible Maine voters without giving the voter notice and an opportunity to cure their ballot or verify their identity."

[¶2] Forty-four days later, on August 7, 2020, ARA moved for a preliminary injunction granting the relief requested in its complaint. Following a hearing and oral argument on September 21-22, 2020, the court (*Stokes, J.*) denied the motion in a twenty-eight-page order, from which ARA appeals. After expedited briefing and oral argument in this Court, we affirm.

## I. DISCUSSION

A.   Standing and Justiciability

1.   Standing

[¶3] No party has raised any issue as to ARA's standing, but we may raise the issue sua sponte as a prudential matter.[3] *See Blanchard v. Town of*

---

[3] We have said that

*Bar Harbor*, 2019 ME 168, ¶ 8, 221 A.3d 554; *Lindemann v. Comm'n on Governmental Ethics & Election Pracs.*, 2008 ME 187, ¶ 8, 961 A.2d 538. We agree with the parties' position at oral argument that standing presents no prudential obstacle in the "unique context" of a pandemic in which this case arises, *Lindemann*, 2008 ME 187, ¶ 8, 961 A.2d 538—a context that all Maine people fervently hope will never recur—especially given that the Maine Constitution affords specific protection to the right to vote by absentee ballot and the right to safety, *see infra* ¶¶ 22, 24, and given that the Alliance's membership consists of retired persons who, as a group, are older, more at risk from the pandemic than younger persons, and more likely to vote by absentee ballot for safety reasons.

2.   Justiciability

[¶4]   "[A]n order granting or denying a motion for a preliminary injunction is not a final judgment and generally is not an action from which we

---

[i]n Maine, standing jurisprudence is prudential, rather than constitutional. Standing is a threshold issue and Maine courts are only open to those who meet this basic requirement. While there is no set formula for determining standing, a court may limit access to the courts to those best suited to assert a particular claim. In addition, the question of whether a specific individual has standing is significantly affected by the unique context of the claim.

*Lindemann v. Comm'n on Governmental Ethics & Election Pracs.*, 2008 ME 187, ¶ 8, 961 A.2d 538 (citation and quotation marks omitted).

4

will entertain an appeal." *Sanborn v. Sanborn*, 2005 ME 95, ¶ 4, 877 A.2d 1075. Accordingly, ARA bears the burden of demonstrating that an exception to the final judgment rule applies before we will reach the merits of the appeal. *See Salerno v. Spectrum Med. Grp., P.A.*, 2019 ME 139, ¶ 7, 215 A.3d 804. As with the standing issue discussed *supra*, no party has raised the issue of justiciability.

[¶5] We conclude that the impending election and corresponding deadline for the receipt of absentee ballots are sufficient to invoke the "death knell" exception to the final judgment rule. That exception "justifies consideration of issues raised on an interlocutory appeal only if awaiting a final judgment will cause substantial rights of a party to be irreparably lost. A right is irreparably lost if the appellant would not have an effective remedy if the interlocutory determination were to be vacated after a final disposition of the entire litigation." *Id.* ¶ 8 (alteration and quotation marks omitted).

[¶6] The exception applies here because once the November election is held, the claimed injury to Born and Berry's constitutional right to vote—which, as discussed *infra* is specific to this pandemic-affected election cycle—cannot be repaired, even if they eventually prevail on their complaint for declaratory judgment after the election.

[¶7]  We reach the merits notwithstanding our decision in *Crafts v. Quinn*, 482 A.2d 825 (Me. 1984), where, in a challenge to statutory nomination petition requirements, we noted that "[a]t first glance" the death knell exception "might seem to apply," because there, as here, were we "to require a final disposition by the Superior Court before we would entertain an appeal, the election would undoubtedly have come and gone before review in this [C]ourt would be available." *Id*. at 827-828.  We nonetheless dismissed the appeal, in part due to the plaintiffs' lack of diligence in pursuing their claim, noting that it would be "anomalous" that their failure to pursue their rights promptly should create a new benefit for them, *i.e.*, interlocutory appellate review.  *Id*. at 828.

[¶8]  This due diligence requirement resonates particularly strongly in the context of a challenge to existing election laws raised shortly before an election is scheduled to take place.  *See Jones v. Sec'y of State*, 2020 ME 117, ¶ 4, --- A.3d --- ("there is a strong public interest in not changing the rules for voting at this late time") (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-6 (2006)).  Here, the plaintiffs filed their complaint on June 24, 2020, although the pandemic emergency was declared in mid-March,[4] and they waited another forty-four days before filing their motion seeking preliminary injunctive relief.  We will

---

[4]  Governor's Proclamation of State of Civil Emergency, signed March 15, 2020, https://www.maine.gov/covid19/timeline (last visited Oct. 21, 2020).

6

apply the death knell exception only because it is not clear whether this matter could have reached finality at the trial court level by the time the plaintiffs filed this appeal had they acted more swiftly. We reiterate, however, that given the concerns recognized in *Jones* and *Purcell*, *see id.*, when challenges to election laws are lodged on the eve of an election it is imperative that plaintiffs act as expeditiously as possible in their pursuit of relief.

B.      ARA's Burden

[¶9]  ARA's complaint contends that the challenged statutory provisions are "an unconstitutional burden on the right to vote," which, pursuant to the Maine Constitution, includes the right to vote absentee, subject to what the Legislature deems "proper enactment" and "reasons deemed sufficient." Me. Const. art. II, §§ 1, 4; *see Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("voting is of the most fundamental significance under our constitutional structure" (quotation marks omitted)); *Opinion of the Justices*, 2017 ME 100, ¶ 49, 162 A.3d 188 ("Voting is a fundamental right, it is at the heart of our democratic process." (alteration and quotation marks omitted)). ARA "bears a heavy burden of proving unconstitutionality, since all acts of the Legislature are presumed constitutional." *Jones v. Sec'y of State*, 2020 ME 113, ¶ 18, --- A.3d --- (alteration and quotation marks omitted). To succeed in its challenge, ARA

"must demonstrate convincingly that the law and the Constitution conflict. All reasonable doubts must be resolved in favor of the constitutionality of the enactment." *Id.* (alteration and quotation marks omitted).

[¶10]   Beyond the "heavy burden" of proving that the Legislature's provisions for accepting absentee ballots are unconstitutional, *id.*, ARA faces another significant burden in seeking the "extraordinary remedy" of a preliminary injunction shortly before a general election. *See Saga Commc'ns of New England, Inc. v. Voornas*, 2000 ME 156, ¶ 19, 756 A.2d 954 ("historically, the Maine courts have taken a conservative attitude toward injunctions, holding the injunction to be an extraordinary remedy only to be granted with utmost caution when justice urgently demands it" (quotation marks omitted)); *Haskell v. Thurston*, 80 Me. 129, 132, 13 A. 273, 274 (1888).

[¶11]   To justify a preliminary injunction in this case, because the requested injunctive relief has "mandatory aspects" and does not simply seek "to preserve the status quo," *Dep't of Env't Prot. v. Emerson*, 563 A.2d 762, 768, 771 (Me. 1989), ARA must demonstrate that it has a "clear likelihood of success on the merits" of its complaint, *id.* at 768, 771, and must additionally "demonstrate that (1) it will suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm which granting the injunctive

8

relief would inflict on the other party; . . . and [(3)] the public interest will not be adversely affected by granting the injunction," *Bangor Historic Track, Inc. v. Dep't of Agric., Food & Rural Res.*, 2003 ME 140, ¶ 9, 837 A.2d 129. "Failure to demonstrate that any one of these criteria are met requires that injunctive relief be denied." *Id.* ¶ 10. "The fact that appellants are asserting First Amendment rights does not automatically require a finding of irreparable injury." *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (alteration and quotation marks omitted).

[¶12] Turning to the specific statutory provisions challenged by ARA, we review the trial court's findings of fact for clear error and its denial of the requested preliminary injunction for an abuse of discretion. *Bangor Historic Track, Inc.*, 2003 ME 140, ¶ 11, 837 A.2d 129; *Emerson*, 563 A.2d at 768.

C.    Absentee Ballot Receipt Deadline

[¶13] By statute, "[i]n order to be valid, an absentee ballot must be delivered to the municipal clerk at any time before the polls are closed." 21-A M.R.S. § 755. With one exception for very small municipalities, "[t]he polls must be closed at 8 p.m. on election day." 21-A M.R.S. § 626(2).

[¶14]　ARA contends that the statutory deadline unconstitutionally burdens the right to vote absentee in this particular election cycle[5] because (1) the ongoing pandemic will greatly increase absentee voting, (2) many voters will exercise the option to return their absentee ballot by mail in lieu of returning their ballot to their municipal clerk in person, and (3) problems experienced by the United States Postal Service (USPS) will prevent some of those ballots from being received before the deadline if the voter requests and then mails an absentee ballot close to election day.[6]　Although ARA in its complaint asked the Superior Court to enjoin the rejection of absentee ballots that are postmarked by election day and then "arrive at the election office within a minimum of ten days after Election Day," and later changed its request to a seven-day waiting period, it now suggests that a two-day extension would suffice, and would "fit[] neatly" within the two-day deadline for municipal clerks to deliver election returns to the Secretary.　*See* 21-A M.R.S. § 711(3).[7]

---

[5]　ARA concedes that "[i]n a normal, non-pandemic year, this deadline might not necessarily impose as significant a burden on the right to vote."

[6]　By statute, a voter may request an absentee ballot without giving a reason until "the 3rd business day before election day."　21-A M.R.S. § 753-B(2)(D) (2020).

[7]　Title 21-A M.R.S. § 711(3) was recently amended to include the provisions of former 21-A M.R.S. § 712, which was repealed.　P.L. 2019, ch. 636, §§ 14-15 (effective June 16, 2020).

10

[¶15]   Although recognizing that under the federal constitution voting is of "fundamental significance," *Burdick*, 504 U.S. at 433, the United States Supreme Court has said that "[a] State indisputably has a compelling interest in preserving the integrity of its election process," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quotation marks omitted), and so

> as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.  To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes.  Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.  Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

*Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (quotation marks omitted); *see Burdick*, 504 U.S. at 433 (recognizing that, pursuant to the Constitution, "States retain the power to regulate their own elections" and that "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections"); *Perez-Guzman v. Gracia*, 346 F.3d 229, 238 (1st Cir. 2003) ("Fair, honest, and orderly elections do not just happen. Substantial state regulation is a prophylactic that keeps the democratic process from disintegrating into chaos.  Consequently, there is a strong state interest

in regulating all phases of the electoral process . . . ."); *Jones*, 2020 ME 113, ¶ 20, --- A.3d ---.

[¶16] Furthermore, we find it instructive that in a recent case where a United States District Court issued a preliminary injunction affecting an absentee ballot deadline five days before an election, the Supreme Court stayed the injunction, noting that "[t]his Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. ---, 140 S. Ct. 1205, 1207 (2020). The Court emphasized "the wisdom of the *Purcell* principle, which seeks to avoid . . . judicially created confusion," *id.*, referring to its prior holding that, when considering a request for injunctive relief from a statutory election procedure "just weeks before an election," a court is

> required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases . . . . Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.

*Purcell*, 549 U.S. at 4-5. The *Purcell* Court applied its principle of judicial restraint in saying, "Given the imminence of the election and the inadequate time to resolve the factual disputes, our action today shall of necessity allow the

election to proceed without an injunction suspending [the challenged statutory election procedure]." *Id.* at 5-6; *see Respect Maine PAC*, 622 F.3d at 16 (noting "the harm to the public interest from the chaos that will ensue if the Maine election laws . . . are invalidated by a court order in the crucial final weeks before an election").

[¶17]  With these principles in mind, the test for whether a particular ballot regulation, such as Maine's absentee ballot deadline, passes constitutional muster is not necessarily strict scrutiny, rather

> a more flexible standard applies.  A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.
>
> . . . [W]hen those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance.  But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.

*Burdick*, 504 U.S. at 434 (citation and quotation marks omitted); *see Jones*, 2020 ME 113, ¶¶ 20-21, 23-24, --- A.3d ---; *Nader v. Me. Democratic Party*, 2012 ME 57, ¶ 26 n.11, 41 A.3d 551.  "No bright line rule separates permissible

election-related regulation from unconstitutional infringements." *Purcell*, 549 U.S. at 5 (alteration and quotation marks omitted); *see Anderson*, 460 U.S. at 789 ("Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any litmus-paper test that will separate valid from invalid restrictions." (quotation marks omitted)).

[¶18] "Election laws will invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. Here, the Superior Court found that the absentee ballot deadline prescribed by the Legislature in 21-A M.R.S. § 755 "even in 2020, imposes only a modest burden on the right to vote," and we agree. The court accepted ARA's premise that, due to the pandemic, many Maine voters will vote absentee in the November election, and "with the increased use of absentee voting . . . comes the increased risk that some voters will fail to have their absentee ballots delivered on time [by the USPS] so as to be counted." Nevertheless, the court correctly observed that

> allowing voters to obtain an absentee ballot as close to election day as the previous Thursday [pursuant to 21-A M.R.S. § 753-B(2)(D) (2020)] is not necessarily tied to the use of the mail. Rather, it permits a voter to obtain an absentee ballot that can be delivered in person or to a secure lockbox or delivered by a third party. The fact that Maine allows voters to request and obtain an absentee ballot on the Thursday before election day does not somehow render [section 755] unconstitutional because the Postal Service cannot guarantee delivery through the mail by November 3, 2020.

*See* 21-A M.R.S. §§ 753-B(8), 754-A(2) (2020). Beyond the several available options for returning an absentee ballot apart from mailing, the court also found that the State has taken substantial steps to make voting, including absentee voting, safer and more effective. Those changes include designing polling places so as to mitigate exposure to the coronavirus, limiting the number of voters allowed at any one time, and mandating social distancing and face coverings. Further, the Attorney General has joined in successful litigation to prevent operational changes by the USPS that could exacerbate any delay in the return of absentee ballots. *See Pennsylvania v. DeJoy*, No. 20-4096, 2020 U.S. Dist. LEXIS 177334, at *2-6, *129-31 (E.D. Pa. Sept. 28, 2020), *clarified by Pennsylvania v. DeJoy*, No. 20-4096, 2020 U.S. Dist. LEXIS 187732, at *5-8 (E.D. Pa. Oct 9, 2020).

[¶19] The effect on voters of the restriction imposed by the election day deadline is weighed against the State's interest in enforcing the statute, which in this case is significant.[8] *See Burdick*, 504 U.S. at 434. The Secretary highlights, as an essential part of his responsibility "to facilitate an equitable and orderly election," the need for sufficient time to count ballots, entertain challenges,

---

[8] Intervenors assert in their brief that one of those interests lies in "decreas[ing] the risk of fraud that is inherent in mail voting." We find nothing in the record to justify a fear of voter fraud based on Maine's voting procedures, including the option to return absentee ballots by mail.

initiate any necessary ranked-choice voting tabulations, and certify results before other statutory deadlines arrive.

[¶20]  Furthermore, as the Superior Court found, the deadline serves an important state interest in maintaining voter confidence in the integrity of the election by establishing a date certain—established by the people's representatives in the Legislature—on which votes are cast, a date not subject to a court's determination that "the statutory deadline is not really a deadline at all."  As the court aptly stated,

> For this court to unilaterally discard the statutory deadline and impose a deadline of its own choosing, would amount to a judicial re-writing of the election laws.  Moreover, any deadline has aspects of arbitrariness to it, including one crafted by the court.  Such a judicial modification of the deadline risks severe disruption of Maine's electoral process, under circumstances where the burden on the right to vote as a result of the Delivery Deadline is slight.[9]

[¶21]  Applying the "flexible" test prescribed by the Supreme Court and the *Purcell* principle disfavoring court interference in a looming election, we agree.  *Burdick*, 504 U.S. at 434; *Republican Nat'l Comm.*, 140 S. Ct. at 453-54.  The *Burdick* Court stated a principle that is applicable here—"Reasonable

---

[9]  *See* Me. Const. art. III, § 2 (providing that the Judicial Branch "shall [not] exercise any of the powers properly belonging to either of the other[] [branches], except in the cases herein expressly directed or permitted").  We do not opine on the question of whether the Governor has the authority to grant the requested relief under her emergency powers, *see supra* n.4.

regulation of elections . . . *does* require [voters] to act in a timely fashion if they wish to express their views in the voting booth." 504 U.S. at 438. Because "we conclude that the government's interest is sufficient to justify the restriction that the [deadline] requirement places on [the plaintiffs' voting] rights," *Jones*, 2020 ME 113, ¶ 34, --- A.3d ---, ARA has not demonstrated a "clear likelihood of success" on its complaint for declaratory relief from the statutory deadline. *Emerson*, 563 A.2d at 768, 771. Accordingly, the court did not abuse its discretion in denying ARA's motion for injunctive relief on this ground.

[¶22] In reaching this conclusion, we recognize, as emphasized by amici, that the Maine Constitution, unlike its federal counterpart, guarantees citizens of this state the general right to "pursu[e] and obtain[] safety." Me. Const. art. I, § 1. As amici recognize, we have not had occasion to construe the contours of that right, which amici assert must include the right to vote safely with greater protections than those required by the federal Constitution.

[¶23] This Court has the authority and important responsibility to construe the Maine Constitution. *See Morris v. Goss*, 147 Me. 89, 97, 83 A.2d 556, 561 (1951). In doing so, "we are not bound by any of the interpretations which other courts may have made of their own Constitutions. Nor do we follow such interpretations except to the extent that the reasoning upon which they rest is

convincing to us when applied to our Constitution." *Id.* The Supreme Court has recognized that Maine is "free, pursuant to [its] own law, to adopt a higher standard" than that required by the federal Constitution. *State v. Rees*, 2000 ME 55, ¶ 5, 748 A.2d 976 (quotation marks omitted).

[¶24] Assuming, without deciding, that there is a particularized constitutional right to vote safely that is protected by the Maine Constitution, the Secretary's proposed implementation of the applicable statutory procedure is sufficient to guard against any infringement of a Maine citizen's unquestioned constitutionally-protected right to vote absentee, Me. Const. art. II, § 4. The statute imposes a deadline by which a voter must return his or her absentee ballot. 21-A M.R.S. § 755. The Secretary's initiatives provide several "no contact" ways to cure a defective ballot so long as the voter is diligent, *see Burdick*, 504 U.S. at 438, including phone verification, requesting a new ballot to be delivered in the way that the voter selects, or having the ballot challenged (and therefore counted, *see infra* n.12) rather than rejected. As the Superior Court found, and we have discussed, there are many ways for a voter to exercise the franchise in the upcoming election, and an individual voter may "pursu[e] . . . safety," Me. Const. art. I, § 1, in the way that that person sees fit.

18

[¶25]  For these reasons, declaring the statute to be unconstitutional rather than deferring to both the Legislature's judgment in enacting the statute and the Secretary's thorough cure procedures is not the appropriate remedy. We are not legislators nor do we exercise the executive branch's power to implement legislation.[10]  *See* Me. Const. art. III (establishing three branches of government in Maine and providing that no branch "shall exercise any of the powers properly belonging to either of the others").

D.     Absentee Ballot Verification and Rejection Procedures

[¶26]  Maine law gives considerable latitude and assistance to voters who wish to vote by absentee ballot.  *See, e.g.*, 21-A M.R.S. §§ 753-A(3)-(6) (2020) (allowing the designation of a family member or other third person to return the ballot; allowing application for an absentee ballot by phone or electronic

---

[10]  We also agree with the dissent's statement that "[w]e should be uncomfortable extending a legislatively imposed deadline and we should do so reluctantly."  Dissenting Opinion ¶ 51. The Maine Constitution commands that we defer to the Legislature's "proper enactment" of the statutory deadline "for reasons [it] deemed sufficient," "except in the cases … expressly directed or permitted" by the Constitution.  Me. Const. art. II, § 4; art. III, § 2.  We diverge from the dissent's statement only in our conclusion that this is not an appropriate case in which to take that extraordinary step.

Moreover, the dissent agrees with the plaintiffs that the statutory deadline is only unconstitutional "during a once-in-a-lifetime deadly pandemic," Dissenting Opinion ¶ 51, but it does not address how and by whose authority the statutory deadline would once again be constitutionally applied after this election cycle.  I.e., would the preliminary injunction the dissent would compel the Superior Court to issue expire once the court, or this Court, or the Governor, or the Legislature determined that the ongoing emergency, which will extend well beyond election day, had passed? That unanswered question illustrates the danger of this Court exercising executive or legislative powers.

means; providing for assistance to certain voters), 753-B(4)-(5), (8) (2020) (providing for the issuance of a duplicate ballot in certain circumstances; for clerk assistance in voting on-site at nursing homes and certain other licensed facilities; and for absentee voting without application in the presence of the clerk with immediate acceptance of the ballot), 753-C (2020) (special procedures to facilitate absentee voting by participants in the Address Confidentiality Program), 754-A(3) (2020) (allowing an aide to assist voters who have concerns related to "physical disability, illiteracy or religious faith").

[¶27]  Nevertheless, there are some restrictions in addition to the statutory deadline discussed *supra*.  *See* 21-A M.R.S. § 759(3)(E).  By statute, election officials must reject an absentee ballot if, inter alia, the signature on the envelope in which it was returned does not match the signature on the ballot application, or if the affidavit on the envelope is not properly completed. 21-A M.R.S. § 759(3)(A)-(B).

[¶28]  For this election cycle, the Secretary has issued extensive written guidance to municipal election officials that was admitted in evidence at the hearing on ARA's motion for a preliminary injunction.  In cases of a missing or mismatched signature or improper affidavit, that guidance requires a clerk, upon receipt of an absentee ballot, to

> **make a good faith effort to notify the voter as quickly as possible (within one business day at a minimum) that the ballot may be rejected or challenged unless the defect is cured.** If the ballot is received on election day or less than 24 hours before election day, the clerk should make a good faith effort to notify the voter as quickly as possible.

Notification is to be made by "email, using the email address provided on the application; or telephone, using the phone number provided on the application." Detailed, specific procedures for notifying the voter of a potential problem are set out in the guidance. Moreover, the Superior Court found "significant" that the Secretary has established an online absentee ballot tracking system that allows a voter "to follow the journey of their ballot from the time of their request for an absentee ballot to its delivery and receipt by the clerk, including whether it has been rejected."[11]

[¶29] Notwithstanding its recognition of "the commendable strides the Secretary has made . . . to implement cure procedures for rejected ballots," ARA contends that "the procedures still fall short." ARA asks us to "giv[e] voters an opportunity to cure their ballots for two days after Election Day"—five days in the case of a challenged ballot—and permit voters to cure a ballot by completing an affidavit rather than complying with the Secretary's procedures.

---

[11] *See* Maine Secretary of State Absentee Ballot Request page, https://apps.web.maine.gov/cgi-bin/online/AbsenteeBallot/index.pl (last visited Oct. 21, 2020).

Depending on the defect involved, those procedures may include a simple phone call, coming to the town office to cure the defect, requesting a duplicate ballot to be delivered in the manner requested by the voter, or having the ballot challenged (as opposed to rejected) in accordance with 21-A M.R.S. § 673 (2020).[12]

[¶30] ARA asserts that the Secretary's procedures "impose a severe, or at least significant, burden on the right to vote," and, absent injunctive relief, violate an absentee voter's right to procedural due process.[13] We disagree, and conclude that the record supports the court's finding that "[t]he Secretary's procedures for notification and an opportunity to cure have greatly reduced the risk of an erroneous deprivation."[14] We have said that

> [p]rocedural due process requires fundamental fairness, which involves consideration of three factors to assess whether the State has violated an individual's right to due process: [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's

---

[12] Pursuant to 21-A M.R.S. § 696(1) (2020), "A challenged ballot must be counted the same as a regular ballot. The validity of a challenged ballot need not be determined unless it affects the results of an election."

[13] ARA's complaint also stated an equal protection claim. Although that claim remains viable in the underlying declaratory judgment action, ARA has not briefed or otherwise pursued the claim on appeal and we do not discuss it further. *See Mehlhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290.

[14] We share the court's "confiden[ce] that the Secretary of State and the Attorney General, both constitutional officers, will implement the Secretary's procedure."

> interest, including the function involved and administrative burdens that the additional or substitute procedural requirement would entail.

*In re Child of Lacy H.*, 2019 ME 110, ¶ 14 n.3, 212 A.3d 320 (quotation marks omitted).

[¶31]  Applying those factors here, it is beyond dispute that a citizen's right to vote is fundamental.  *Opinion of the Justices*, 2017 ME 100, ¶ 49, 162 A.3d 188.  As we have explained, however, the risk that an absentee voter will be erroneously deprived of that right has been substantially reduced through the procedures instituted by the Secretary, even if the statutory deadline for returning such ballots is adhered to.  Finally, as we have discussed, the State's interest in following statutory directives governing the election is substantial.  *See supra* ¶¶ 19-20.

[¶32]  In sum, we conclude that absentee voters will be afforded "fundamental fairness" in the November 2020 election.  *In re Child of Lacy H.*, 2019 ME 110, ¶ 14 n.3, 212 A.3d 320 (quotation marks omitted).  Accordingly, ARA has not shown a "clear likelihood of success" on its complaint for declaratory relief, and the court did not abuse its discretion in denying ARA injunctive relief on this ground.  *See Bangor Historic Track, Inc.*, 2003 ME 140, ¶ 11, 837 A.2d 129; *Emerson*, 563 A.2d at 768.

The entry is:

> Decision denying motion for preliminary injunction affirmed.

_____

JABAR, J., dissenting.

[¶33] I respectfully dissent because I believe that we should be looking to the Maine Constitution and not the Federal Constitution to protect the constitutional rights of Maine citizens. The right to vote by absentee ballot is enshrined in the Maine Constitution—in Article II, section 4—but no such comparable right appears in the Federal Constitution.[15] Normally we should not be interfering with a legislative deadline, but we are not living in normal times. We are confronted today with a crisis in our electoral process because the Legislature, understandably, did not anticipate a once-in-100-years deadly pandemic compounded by the United States Postal Service's problems delivering the mail on time.

---

[15] The Maine constitution provides for the right to vote absentee, Me. Const. art. II, § 4, and Maine statute provides the right to vote absentee by mail. 21-A M.R.S. § 754-A (2020).

## I. DISCUSSION

### A.    The Health Crisis

[¶34]  The COVID-19 pandemic is a global health crisis, the likes of which we have not seen since the 1918 influenza pandemic.  In the U.S. we have experienced over 7 million cases and 215,000 deaths, with a projected uptick this fall and winter season.  This spring, the governor postponed the state's primary due to concerns for the health of voters, poll workers, and election officials.  The Secretary of State encouraged voters to vote by absentee ballot, stating that he was recommending that Maine voters use the absentee voting process to maintain social distancing measures, mitigate the outbreak, and vote from the safety of their homes.  In the delayed July primary, 55% of voters voted absentee, whereas history tells us that no more than 10% ever voted absentee. Of those absentee votes, 35% were by mail.

[¶35]  The COVID-19 pandemic is still among us.  By mid-September, Maine's coronavirus cases were trending upward, leading the Governor to extend the state of emergency for the sixth time.  Maine citizens are requesting ballots for the November general election at a record-shattering pace.  As of mid-September, nearly 200,000 Maine citizens had already requested absentee ballots.

[¶36] Even if the only issue were the increased number of people voting absentee by mail, this by itself would undoubtedly create problems for Maine's ballot collecting process; however, the health crisis resulting from the COVID-19 pandemic is compounded by serious difficulties with the postal service's ability to deliver mail on time.

B.      United States Postal Service Crisis

[¶37] Added to the problems occasioned by the COVID-19 pandemic are the United States Postal Service's difficulties in delivering the mail. Before the pandemic, the postal service delivered 96% of first-class mail within two to five days. In the first week of September 2020, the postal service delivered just 82% to 87% percent of first-class mail within that time frame. The postal service has acknowledged its shortcomings. In a letter to the Maine Secretary of State, a representative of the United States Postal Service stated, among other disturbing things, the following:

> [W]e wanted to note that . . . certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards.
>
>       . . . .
>
> To allow enough time for ballots to be returned to election officials, domestic voters should generally mail their completed ballots at least one week before the state's due date.

. . . .

[T]he Postal Service cannot adjust its delivery standards to accommodate the requirements of state election law.

[¶38] It is the COVID-19 pandemic coupled with the postal service's delivery problems that have created the voting crisis that we are presently confronting. It is easy to say that the Legislature, and only the Legislature, must deal with the problems we confront today. However, we have been asked to grant a preliminary injunction because the health crisis and postal service crisis we are confronting infringes on a voter's constitutional right to vote by absentee ballot. Action by the Legislature dealing with the problems surrounding the COVID-19 pandemic will be too late for voters in this upcoming election.

C. Maine Constitution

[¶39] We have held that we must examine state constitutional claims before reaching any federal questions. *State v. Flick*, 495 A.2d 339, 343-44 (Me. 1985). The U.S. Supreme Court has stated that it will refuse to decide cases where there is an adequate and independent state ground for relief out of "respect for the independence of state courts." *Michigan v. Long*, 463 U.S. 1032, 1040 (1983). Here, we have a Maine constitutional provision, with no equivalent in the Federal Constitution, that provides a Maine citizen with the

constitutional right to vote by absentee ballot.[16]  We should be looking to the Maine Constitution "as the prime guarantor of the liberties of Maine's people." Tinkle, *The Maine State Constitution* 20 (2d ed. 2013).

[¶40]  Article II, section 4 of the Maine Constitution states:

> The Legislature under proper enactment shall authorize and provide for voting by citizens of the State absent therefrom in the Armed Forces of the United States or of this State and for voting by other citizens absent or physically incapacitated for reasons deemed sufficient.

Since the right to vote by absentee ballot is a Maine constitutional right, any infringement on that right must be subject to close scrutiny.  The U.S. Supreme Court has articulated an analytical approach that weighs the competing interests put forward by the parties.  Even though we are interpreting Maine's Constitution, there is no reason not to adopt the analytical approach used by the federal court in protecting federally protected rights.  In *Anderson v. Celebrezze*, 460 U.S. 780, 789-90 (1983), the Court explained the analytical approach to be used in these cases:

> Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any litmus[-]paper test that will

---

[16]  We are free to accord Maine citizens greater rights than those provided under federal jurisprudence when it comes to the protection of individual rights.  *See State v. Collins*, 297 A.2d 620, 626 (Me. 1972) (recognizing that Maine's higher standard of proof regarding the voluntariness of confessions is a "value [that] has been endowed with the highest priority by being embodied in a constitutional guarantee . . . [and therefore] we believe that it must be taken heavily into account in the formulation of the public policy of this State.").  Unlike in the *Collins* case, here we are interpreting a right to vote absentee, a right not enumerated in the Federal Constitution.

separate valid from invalid restrictions. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. The results of this evaluation will not be automatic; as we have recognized, there is no substitute for the hard judgments that must be made.

[¶41] We begin the evaluation by examining the interests put forward by the State. Maine law allows voters to request absentee ballots up to three business days before the election and to return the ballot by mail. 21-A M.R.S. §§ 753-B(2)(D), 754-A (1)(D) (2020). All absentee ballots must be received by 8:00 p.m. on election day. *See* 21-A M.R.S. § 755 (2020). There is a legitimate state interest in receiving all ballots by election day, whether the ballot is cast in person or by mail. The State has an interest in maintaining voter confidence in the integrity of the election and administering an equitable, orderly election. The questions before us are whether the election day deadline for mail-in absentee ballots, considering the health crisis and postal service problems we are facing, places any burden on the constitutional right guaranteed by the

Maine Constitution to vote by absentee ballot, and whether the State interest is outweighed by the burden placed on a Maine voter's right to vote by absentee ballot.

[¶42]  Given the present crisis, these provisions do not protect a voter's right to vote by absentee ballot.  Even if a voter obtained an absentee ballot on the last day available under the law and put the ballot in the mail on the same day, there is no guarantee or even a probability that the vote will be received by the local clerk by election day.  More disturbing is the fact that absentee ballots put in the mail up to seven days before the election may not be received by local clerks by election day.  The postal service has stated that it will have difficultly delivering absentee ballots within seven days, and has recommended that voters mail in their absentee ballots at least seven days before the election.  These delays by the postal service do more to question the legitimacy and integrity of the electoral process than a two-day extension for mail-in absentee ballots.  Under these circumstances, it is easy to conclude that ensuring that absentee ballots arrive in the clerk's office by election day is a burden on any Maine citizen's constitutional right to vote by absentee ballot.  Although denying relief to voters, the Superior Court found that the law imposes a

30

"modest burden" on the voter. ARA contends that the law imposes an "undue burden" on the voter.

[¶43] Even if we conclude that the burden is a "modest burden," and not, as ARA contends, an "undue burden," we must weigh this "modest burden" on the voter against the state interest in receiving all absentee ballots by election day.

[¶44] The Secretary of State contends that allowing ballots received up to two days after the election will "severely disrupt Maine's electoral process." The facts do not support this claim. The Secretary conceded at oral argument that a change in the deadline for receiving absentee ballots by two days will not affect how voters cast their ballots. The impact will be on the vote collection and compilation process. Maine requires local clerks to file attested copies of their election returns with the Secretary of State within three business days after election day. 21-A M.R.S. § 711(3) (2020). According to the projected numbers of late absentee ballots provided by the Secretary, there will be a minimal impact on the electoral process. The Secretary has projected that 600-700 absentee ballots will be received after election day. With 500 voting

districts in Maine, local clerks will be dealing with an average of one to one and a half late absentee ballots.[17]

[¶45]   Having to count a few late absentee ballots received within two days of the election and add the count to the count of the ballots received by election day is an insignificant burden on the system.   Local clerks will have sufficient time to adjust the totals within the two days following the election in order to submit their report to the Secretary within the statutory reporting date of three days post-election.   *See* 21-A M.R.S. § 711(3).

[¶46]   When you weigh the burden on a Maine citizen's right to vote absentee with the minimal burden on local clerks to add an average of one or two absentee ballots received within two days of the election, you can come to only one conclusion—the burden on the voter greatly outweighs the burden on local clerks.   Counting mail-in absentee ballots that are postmarked by election day and received within two days of the election will not cause any disruption, much less a major disruption, in the state's electoral process.

[¶47]   We should follow the lead of the Pennsylvania Supreme Court. Confronted with the identical situation facing us, i.e., a legislatively set deadline of election day for the receipt of absentee ballots, the court extended the

---

[17]  ARA's expert suggests that around 2,400 ballots will be received late, equating to an average of four to five late ballots per voting district.

deadline for three days and further held that even ballots that are received without a postmark will be "presumed to have been mailed by Election Day". *Pa. Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 Pa. LEXIS 4872, at *89 (Sept. 17, 2020).[18]

[¶48]   In balancing the interest of the voter with the state interest of setting a deadline, the Pennsylvania Supreme Court stated,

> We are fully cognizant that a balance must be struck between providing voters ample time to request mail-in ballots, while also building enough flexibility into the election timeline to guarantee that ballot has time to travel through the USPS delivery system to ensure that the completed ballot can be counted in the election. Moreover, we recognize that the determination of that balance is fully enshrined within the authority granted to the Legislature under the United States and Pennsylvania Constitutions.

*Id.* at *45-46.

[¶49]  The court recognized that the extension of the deadline for receipt of ballots was at variance with Pennsylvania's election law, and made it clear that it was not holding that the election day deadline was unconstitutional on its face, but was an "as applied" infringement of the elector's right to vote in the middle of a pandemic.  The court held it was a temporary remedy made necessary by the health crisis.  *Id.* at *50.

---

[18]  ARA limited their request to counting mail-in ballots that are postmarked by election day received within two days after that.

[¶50]  Several days ago, on October 19, 2020, the U.S. Supreme Court denied a request for a stay, leaving in place the *Pa. Democratic Party v. Boockvar* order granting the three-day extension.  *See Republican Party of Pa. v. Boockvar,* 2020 U.S. LEXIS 5181, --- S. Ct. ---, 2020 W.L. 6128193.  The court split 4-4, thereby denying the Republican Party's Emergency Application For Stay Pending Disposition Of A Petition For Writ Of Certiorari.

## II. CONCLUSION

[¶51]  We should be uncomfortable extending a legislatively imposed deadline and we should do so reluctantly, but we cannot ignore the untenable position in which Maine voters find themselves by having to exercise their constitutional right to cast an absentee vote in the middle of a deadly pandemic. The Maine Legislature cannot act before election day and the only remedy to protect the constitutional right to cast a vote by absentee ballot is a preliminary injunction extending the deadline for two days for any ballots postmarked on or before election day.[19]  The Secretary has taken numerous positive steps to assist absentee voters during this pandemic, and as a result of this commendable effort, many Maine voters who decide to mail in their absentee ballot will avoid missing the election day deadline.  Although the Secretary has

---

[19]  In the 2018 general election, more than 86% of rejected ballots arrived within two days after the deadline.

taken steps to ameliorate the effects of the pandemic, he cannot rectify the shortcomings of the United States Postal Service. We cannot ignore those Maine voters, projected to number at least 600-700, who will have their constitutional right to vote by absentee ballot impacted by the COVID-19 pandemic and the United States Postal Service's delivery problems. The election day deadline for the receipt of mail-in absentee ballots is unconstitutional "as applied" during a once-in-a-lifetime deadly pandemic. I conclude by quoting from *Storer v. Brown*, a case cited by the *Anderson v. Celebrezze* Court that reviewed election laws:

> The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a matter of degree, very much a matter of considering the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification. What the result of this process will be in any specific case may be very difficult to predict with great assurance.

415 U.S. 724, 730 (1974) (alterations omitted) (citations omitted) (quotation marks omitted).

[¶52] I would vacate the judgment and direct the Superior Court to grant the request for a preliminary injunction requiring the Secretary of State to count any mail-in ballots postmarked on or before election day and received

within two days of election day.  I would affirm the other aspects of the Superior Court's decision.

———————————

Matthew S. Warner, Esq., Preti Flaherty Beliveau & Pachios, LLP, Portland, and John Devaney, Esq. (orally), Perkins Coie LLP, Washington, District of Columbia, for appellants Alliance for Retired Americans, Vote.org, Doug Born, and Don Berry

Aaron M. Frey, Attorney General, Phyllis Gardiner, Asst. Atty. Gen. (orally), Thomas Knowlton, Asst. Atty. Gen., and Jason D. Anton, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellees Secretary of State and Attorney General

Patrick Strawbridge, Esq. (orally), and Alexa R. Baltes, Esq., Consovoy McCarthy PLLC, Boston, Massachusetts and Arlington, Virginia, for appellees Donald J. Trump for President, Inc., Republican National Committee, National Republican Senatorial Committee, and Republican Party of Maine

Zachary L. Heiden, Esq. (orally), and Emma E. Bond, Esq., American Civil Liberties Union of Maine Foundation, for amicus curiae American Civil Liberties Union of Maine Foundation

Beth Ahearn, Esq., Maine Conservation Voters, Augusta, for amicus curiae Maine Conservation Voters

Kennebec County Superior Court docket number CV-2020-95
FOR CLERK REFERENCE ONLY